**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 94-50716**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**BRADFORD ALLEN BULLOCK,**

**Defendant-Appellant.**

Appeal from the United States District Court
for the Western District of Texas

December 11, 1995

Before POLITZ, Chief Judge, HILL,[1] and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Bradford Allen Bullock appeals his conviction for felon in possession of a firearm, armed bank robbery and using a firearm during a violent crime. Bullock claims that the district court erred in refusing to sever the felon in possession of a firearm count from the other two counts and in admitting evidence that was obtained in violation of the Fourth Amendment. Finding no error by the district court, we AFFIRM Bullock's convictions.

_____

[1] Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

**BACKGROUND**

On August 21, 1992, a white man carrying a revolver robbed a San Antonio branch of the Bank of America of $6,561.50. The robber was wearing a black mask, a red baseball cap, a windbreaker, light colored pants with a dark belt and glasses under his mask. The employees in the bank testified that the robber was a white male between five feet six inches and six feet tall, weighed approximately 165 pounds and had freckles. The branch manager and a teller were the only employees in the bank. The robber ordered the teller to fill a sack with money, which she did. The teller also gave the robber "bait bills," the serial numbers of which were on file with the bank. At trial, the bank employees testified that they could not identify Bullock as the robber, nor could they rule him out.

About half an hour before the robbery, a security guard at a nearby apartment complex saw a suspicious-looking man and woman. The man was wearing long light colored pants, a white long sleeve shirt, a red Marlboro baseball cap and dark sunglasses. He was white, approximately five feet ten inches tall, weighed between 160 and 170 pounds and was in his late twenties or early thirties, with an average body build. The man was in a beige, four door, Chevrolet type vehicle and an unknown woman was in the driver's seat. The guard was not able to positively identify the man or woman during photographic or live line-ups.

Shortly after the robbery, police investigating the crime scene found a red Marlboro baseball cap in the bank's parking lot. Later analysis by the FBI laboratory found head hairs on this cap and a substance suitable for DNA analysis. Still later, microscopic examination by an FBI hair expert found a match between Bullock's hair and the hair recovered from the cap. Likewise, an FBI DNA

2

expert found that the DNA in the cap matched Bullock's DNA sufficient to exclude 96% of the caucasian population.

Approximately 15 minutes after the robbery, $1,575 in cash deposits were made in Bullock's wife's name into her bank account. This brought the account balance to its highest level in many months.

The FBI quickly began surveilling Bullock's residence in Live Oak, Texas. Forty-five minutes after the robbery, Bullock and his wife returned home in his wife's car, which matched the description of the car the security guard saw before the robbery. Bullock was not wearing a cap or a shirt, but he was wearing white-colored pants with a black belt. Five minutes later, Bullock left the house and drove away in his wife's car. Police officers from the Live Oak Police Department were directed to stop Bullock and they stopped him for speeding.

When Bullock was stopped, the police ordered him out of the car, made him lie on the ground and drew their weapons on him. Bullock was then handcuffed and placed in the back of a police car. The police determined that Bullock had outstanding municipal court arrest warrants for traffic violations, so he was arrested and his car seized. Bullock was carrying $900 in cash when he was arrested. Police found a fully loaded .22 caliber Ruger revolver in the trunk, which Bullock admitted knowing was in the car and which he had handled. All parties agree, however, that the gun found in Bullock's car was a different gun from the gun used in the robbery.

Later that evening, FBI agents searched Bullock's home pursuant to a search warrant and found a bag containing $4,052, including the bait bills taken from the bank.

During Bullock's detention prior to trial, the FBI obtained a search warrant to obtain samples of his blood and hair for DNA and other analysis. Bullock refused to comply with the warrant, so

3

a seven member "control team" was used to subdue him and get the blood and hair samples. Bullock was cuffed and shackled between two cots that were strapped together. He physically resisted by kicking, hitting and attempting to bite the agents. A towel was placed on Bullock's face because he was spitting on the agents. A registered nurse took blood from Bullock's hand and then combed and plucked twenty hair samples from his scalp.

Bullock was charged in a superseding indictment with (1) firearm possession by a convicted felon in violation of 18 U.SC. § 922(g)(1), (2) armed bank robbery in violation of 18 U.S.C. § 2113(d), and (3) using a firearm during a violent crime in violation of 18 U.S.C. § 925(c). Bullock filed two motions to suppress evidence. One motion concerned the evidence obtained when Bullock was stopped and arrested on the day of the robbery, while the second motion dealt with the blood and hair samples. Both motions were denied. Bullock also filed a motion seeking to sever the firearm counts from the bank robbery count. This motion was denied. A jury found Bullock guilty of all three counts and the district court sentenced him to 222 months in prison.

## DISCUSSION

### I.   Motion to Sever

Bullock claims that the district court erred in refusing to sever the felon in possession of a firearm charge from the other counts. He argues that because the jury was informed that he was a felon who possessed a gun during a robbery, there is a danger that the jury convicted him because he was a "bad person," rather than on the evidence.

Rule 8(a) of the Federal Rules of Criminal Procedure provides that:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on

4

the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Joinder of charges is the rule rather than the exception and Rule 8 is construed liberally in favor of initial joinder. **United Stated v. Park**, 531 F.2d 754, 761 (5th Cir. 1976).

We review a district court's denial of a severance motion for abuse of discretion. **United States v. Holloway**, 1 F.3d 307, 310 (5th Cir. 1993). "In reviewing the district court's denial of a motion to sever, the preliminary inquiry is whether, as a matter of law, initial joinder of the counts was proper under Rule 8(a)." **Id**. (internal quotation omitted). Even if it is determined that initial joinder was improper, in order to demonstrate reversible error, Bullock must still show clear, specific and compelling prejudice that resulted in an unfair trial. **Id**. at 310-11.

Bullock asserts that, under **Holloway**, the initial joinder was improper. In **Holloway**, we held that the district court abused its discretion in failing to sever a robbery charge and a charge of felon in possession of a firearm that occurred two months after the robbery. Because there was no indication of a connection between his possession of the firearm and the robbery, Bullock contends, joinder of the counts was improper.

Bullock further argues that he was prejudiced because the firearm charge allowed the jury to hear otherwise inadmissible evidence that he was a convicted felon. Therefore, he contends, there is the danger that the jury convicted him because he is a "bad person" rather than because the evidence proved him guilty of bank robbery. Bullock argues that, as in *Holloway*:

> the jury emphatically was told that [he] was a bad and dangerous person "by his very nature", and that a felon who carried a gun was just the sort of character who was most likely to have committed the robberies charged in the indictment. In short, [he] was unjustifiably tried, at least in part, on the basis

5

> of who he was, and not on the basis of the material evidence presented against him.

*Id*. at 312.

We disagree with Bullock. All three counts were properly joined in one indictment. While Bullock did not use the gun involved in count one in the bank robbery, it was found in the trunk of the getaway car within hours of the robbery. Therefore, a factfinder could infer that Bullock had the gun so that it would be available to him during the robbery and escape. We have allowed the joinder of firearm charges with other offenses when the gun was found during the investigation of the offense. *See United States v. Fortenberry*, 919 F.2d 923, 926 (5th Cir. 1990), *cert. denied*, 499 U.S. 930 (1991); *Park*, 531 F.2d at 761 (approving of *United States v. Pietras*, 501 F.2d 182, 184-87 (8th Cir.), *cert. denied*, 419 U.S. 1071 (1974)).

Bullock's reliance on *Holloway* is misplaced. In *Holloway,* the gun was found when Holloway was arrested, *two months* after the last charged robbery. Additionally, the firearm was not connected in any way with the robberies. The *Holloway* court noted that if the firearm charge had been related to the robbery charges, initial joinder would have been proper. *Holloway*, 1 F.3d at 312, n.4. We have held on several occasions that a district court may properly refuse severance even though proof on one of the counts requires proof of a prior felony conviction. *See Breeland v. Blackburn*, 786 F.2d 1239, 1241 (5th Cir. 1986); *Holloway*, 1 F.3d at 312, n.4. Bullock's possession of the firearm just hours after the robbery is the same act or transaction and, therefore, joinder was proper.

Even if joinder was not initially proper under Rule 8(a), Bullock cannot show that he was prejudiced by the failure to sever the counts, as the court admonished the jury that it could consider

6

Bullock's prior felony conviction only in connection with the firearm count.[2] Any possible prejudice could be cured with proper instructions and juries are presumed to follow their instructions. *See Zafiro v. United States*, 113 S. Ct. 933, 939 (1993). Therefore, the jury instructions were sufficient to cure any possible prejudice

## II.     Blood and Hair Samples

Bullock argues that the district court erred in admitting into evidence blood and hair samples taken in violation of the Fourth and Sixth Amendments. "In reviewing a district court's ruling on a motion to suppress evidence based on testimony at a suppression hearing, we must accept the district court's factual findings unless they are clearly erroneous or are influenced by an incorrect view of the law." *United States v. Garcia,* 849 F.2d 917, 917 n.1 (5th Cir. 1988). We review issues of law *de novo*. *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1630 (1994).

### A.  Unreasonable Search and Seizure

Bullock contends that the taking of the blood and hair samples violated his Fourth Amendment right to be free from unreasonable searches and seizures. Relying on *Winston v. Lee*,

---

[2]The relevant jury instruction read:

> You have been told that the defendant has previously been convicted of an offense punishable by imprisonment for a term exceeding one year. This conviction has been brought to your attention only to establish an element of the offense charged against the defendant in Count One of the indictment. The fact that the defendant was previously found guilty of another crime does not mean that the defendant committed the crimes for which the defendant is on trial, and you must not use this prior conviction as proof of the crimes charged in this case.

7

470 U.S. 753 (1985), he argues that compelling a person to undergo a medical procedure is an unreasonable intrusion, even though probable cause exists.

In *Winston*, a defendant was shot during a robbery and the police wanted as evidence the bullet which was still lodged in his leg. The government sought to have him operated upon under general anesthesia in order to remove the bullet. The Supreme Court held that even though probable cause existed, the search and seizure was unreasonable. The Court balanced three factors, drawn from *Schmerber v. California*, 384 U.S. 757 (1966), in making its decision: (1) the extent to which the procedure may threaten the safety or health of the individual; (2) the extent of intrusion upon the individual's dignitary interest in personal privacy and bodily integrity; and, weighed against these interests, (3) the community's interest in fairly and accurately determining guilt and innocence.

Bullock argues that because the DNA tests were of little value, the search did little to help the truth-seeking pro cess and, therefore, the search was unreasonable. He claims that there were many people who the DNA tests could not exclude, so the tests were not necessary for determining guilt or innocence. He asserts that four percent of caucasians, two percent of blacks and five percent of Hispanics would have comparable DNA. This, Bullock contends, would mean that thousands of people in Bexar County could not be excluded as the robber and, therefore, the need to acquire the evidence was low.

8

As the government concedes, the blood sample was a Fourth Amendment search.[3] However, applying the *Schmerber* factors, the search was reasonable. The first *Schmerber* factor, the extent to which the procedure may threaten the safety or health of the individual, weighs in favor of the government. The samples were taken by a registered nurse, who used proper technique, and Bullock has not argued that the blood or hair tests posed any threat to his health or safety.

The second *Schmerber* factor, the extent of the intrusion upon the individual's dignitary interest in personal privacy and bodily integrity, also favors the government, as taking blood samples is virtually risk and pain free when properly performed. The Supreme Court has observed that blood samples have become "routine in our everyday life." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 625 (1989). Bullock presented no evidence that the method of blood and hair withdrawal was not in conformity with accepted medical practice or that it exposed him to unacceptable risk or pain. There was evidence showing appropriate medical technique was used and that there was no unacceptable risk or pain.

The use of force in taking the samples was caused by Bullock's refusal to comply with a lawful warrant and was reasonable. Because Bullock had threatened to resist the execution of the warrant, the agents sought and received judicial approval to use physical force. When Bullock resisted the sample-taking, the agents used the force necessary to restrain him while samples were

---

[3]Courts are divided on the question of whether taking a hair sample rises to the level of a Fourth Amendment search or seizure. *See*, *e.g.*, *United States v. DeParias*, 805 F.2d 1447, 1456-57 (11th Cir. 1986), *cert. denied*, 482 U.S. 916 (1987); *United States v. Anderson*, 739 F.2d 1254, 1256-47 (7th Cir. 1984). Even if the hair sample was a search or seizure, there was a warrant and, applying the Schmerber factors, the search was reasonable. Therefore, we need not decide whether taking hair samples is a Fourth Amendment search or seizure.

taken.[4]  Bullock was given multiple opportunities to comply with the warrant;  he was the one who decided that physical force would be necessary.

Finally, we must weigh the third *Schmerber* factor, the community's interest in fairly and accurately determining guilt and innocence.  The government need for the scientific evidence from the blood and hair samples was great.  Eyewitnesses could not identify the robber and bank surveillance photographs were not helpful.  Bullock, rather than confessing to the robbery, served notice of an alibi defense and provided an exculpatory explanation for his whereabouts and activities at the time of the robbery and for the robbery loot found in his house.  Therefore, the government needed the scientific evidence to prove Bullock's guilt.

Weighing all of the *Schmerber* factors, the search was reasonable.  The drawing of blood and the removing of a few hairs is not an intrusion that rises to the level of major surgery.  The relatively minor risk and intrusion on Bullock was offset by the need for the evidence.  The fact that the agents rushed in, grabbed Bullock and tied him to a bed during the procedure is unfortunate.  However, it was Bullock's refusal to comply with a lawful warrant which forced the situation.  Bullock cannot resist a lawful warrant and be rewarded with the exclusion of evidence.

*B.  Right to Counsel*

Bullock argues that his Sixth Amendment right to counsel was violated because his attorney was not present during the procedures.  He contends that, under *United States v. Wade*, 388 U.S. 218 (1967), a defendant has a right to counsel at any critical confrontation by the prosecution where results might determine his fate and the absence of counsel might affect his right to a fair trial.

---

[4]Bullock had no right to resist execution of a search warrant.  In fact, his actions may even have risen to the level of criminal conduct.  *See* 18 U.S.C. § 111 (assaulting or resisting federal agent carrying out duties punishable by up to three years in prison).

Bullock is correct that a defendant has a right to counsel during any critical confrontation by the prosecution. However, the taking of blood and hair samples are not critical confrontations. *Wade*, 388 U.S. at 227 (taking of blood and hair samples not critical stages); *United States v. Douglas*, 919 F.2d 932, 935 (5th Cir. 1990), *cert. denied*, 501 U.S. 1234 (1991) (taking of hair samples not critical stage); *Smith v. Puckett*, 907 F.2d 581, 583 (5th Cir. 1990) (taking of blood sample not critical stage). Therefore, there was no Sixth Amendment violation and the district court did not err in admitting the evidence.

## III. Warrantless Search of Bullock's Car at Arrest

Bullock complains that the district court erred in admitting the evidence found during the warrantless search of his car. During the search, the police found approximately $900 in cash and a .22 caliber Ruger revolver.

Warrantless searches are presumptively unreasonable. *Horton v. California*, 496 U.S. 128, 133 (1990). However, there is an exception to the warrant requirement when an officer conducts an inventory of seized property if that inventory is part of a *bona fide* "routine administrative caretaking function" of the police. *United States v. Skillern*, 947 F.2d 1268, 1275 (5th Cir. 1991), *cert. denied*, 503 U.S. 949 (1992). Inventories serve three purposes: (1) to protect the owner's property while it is in police custody; (2) to protect the police against claims or disputes over lost or stolen property; and (3) to protect the police or public from potential danger. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

The Fourth Amendment requires only that an inventory not be a "ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1 (1990); *United States v. Walker*, 931 F.2d 1066, 1068 (5th Cir. 1991). "In order to prevent inventory searches from

11

concealing such unguided rummaging, Supreme Court has dictated that a single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Walker*, 931 F.2d at 1068 (internal quotation omitted). The Supreme Court requires that "inventories be conducted according to standardized criteria," although the policy need not be written. *Id*. at 1068-69.

Bullock argues that the officer who searched his vehicle did not testify that there were any standards regarding inventory searches. Bullock claims that the officer's testimony was merely "affirmations in response to the prosecutor's questions." Bullock contends that because no standards were shown, the search was not a valid inventory search and was, therefore, an unreasonable warrantless search.

At the suppression hearing, the officer testified that he followed standard procedures set out by the Live Oak Police Department. Bullock's counsel asked no questions of the officer regarding the standards. The officer's unrebutted testimony is sufficient to establish that he acted in accordance with standard inventory procedures. *United States v. Breeland*, 53 F.3d 100, 103 (5th Cir. 1995). Therefore, the district court's finding that the officer acted in accordance with standard police procedures was not clearly erroneous, the search was a valid inventory search and the district court did not err in denying Bullock's motion to suppress the evidence.

## IV.     Testimony That Witnesses Could Not Exclude Bullock

The bank manager, teller and security guard could not identify Bullock. However, they did testify that they were not able to *exclude* Bullock, either. Without resort to caselaw, Bullock argues that it was error to allow them to testify that they could not exclude him, as this invited the witnesses

and jury to speculate. He argues that the government had the burden of proving him guilty beyond a reasonable doubt and, therefore, testimony regarding whether he could be ruled out was irrelevant and improper.

Bullock did not timely object to the government's questioning on whether Bullock could be ruled out as the robber.[5] Therefore, Bullock must show plain error by the trial court. *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), *cert. denied*, 115 S. Ct. 1266 (1995).

The district court did not commit error, and certainly not plain error, in allowing the testimony, because it was Bullock's counsel who raised the issue of whether the witnesses could identify Bullock. After the witnesses testified during cross-examination that they could not identify Bullock as the robber, the government asked them on re-direct examination if they could say that Bullock was not the robber. They testified that they could not exclude Bullock. Because Bullock raised the issue, it was not plain error for the district court to allow this questioning.

## V.    Issues Raised in Supplemental Brief

Bullock, through his appointed counsel, filed an original brief on May 5, 1995, which the government responded to on June 7. Bullock did not file a reply brief. The case was scheduled for oral argument on September 26. On September 11, Bullock filed a motion for leave to file a supplemental brief *pro se*. His attorney, on September 21, filed a motion to adopt Bullock's *pro se* supplemental brief and a motion for leave to file a supplemental brief. We granted Bullock's counsel's motions on September 22, the Friday before the Tuesday oral argument. We denied as

---

[5]Bullock did object to one question on this subject asked of the security guard. However, the answer to that question did not add anything to the government's case and was, therefore, cumulative. Any possible error in admitting this testimony was thus harmless. *See* Fed. R. Crim. P. 52(a); Fed. R. Evid. 103(a).

moot Bullock's motion to file the brief *pro se*. The government filed a responsive supplemental brief on October 2 and, on November 14, with leave of the court, Bullock filed a *pro se* reply brief, which his counsel had adopted.

In his supplemental brief, Bullock raised two issues: (1) whether the stop of his vehicle and gun-point arrest violated the Fourth Amendment and (2) whether the district court erred in not conducting a **Franks v. Delaware** hearing to determine if the FBI agent lied in obtaining the search warrant. Neither of these issues were raised in Bullock's original brief. "An appellant abandons all issues not raised and argued in [his] *initial* brief on appeal." **Cinel v. Connick**, 15 F.3d 1338, 1345 (5th Cir.), *cert. denied*, 115 S. Ct. 189 (1994) (emphasis in original); *see also* **United Paperworkers Int'l Union v. Champion Int'l Corp.**, 908 F.2d 1252, 1255 (5th Cir. 1990).

We are satisfied that no injustice is done by deeming Bullock's issues waived. Bullock's contention that the police lacked probable cause to stop his car and arrest him at gun-point is without merit. The district court found that the police officer observed Bullock speeding and driving in an unsafe manner before he was stopped. The officers clearly had the right to stop him for these traffic offenses.

Likewise, the officers were justified in drawing their weapons on Bullock. The officers had been informed over the radio that Bullock was a suspect in a robbery committed just hours before. The officers were familiar with Bullock from previous encounters and knew him to be a dangerous man, one who had previously resisted arrest and threatened police. Against that backdrop, we cannot say the officers were wrong in drawing their weapons on Bullock. Faced with a robbery suspect with a known history of violence, the officers took reasonable steps to protect themselves.

Bullock never raised the *Franks v. Delaware* issue at the district court level, even though the alleged falsehoods were known to him at the time. Therefore, even if we were to consider the issue, Bullock would have the considerable task of showing plain error. *See*, *e.g.*, *United States v. Maldonado*, 42 F.3d 906, 909-10, 913 (5th Cir. 1995).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.