2 P.3d 1255

**STATE of Arizona, Appellee,**

v.

**Peter J. CLARY, Appellant.**

No. 1CA–CR97–0307.

Court of Appeals of Arizona,
Division 1, Department A.

Jan. 20, 2000.

Review Denied May 23, 2000.

Janet A. Napolitano, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Diane M. Ramsey, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Edward F. McGee, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

TOCI, Judge.

¶ 1 Peter J. Clary ("defendant") appeals his convictions and sentences for two counts of aggravated driving under the influence of intoxicating liquor ("aggravated DUI"), class 4 felonies. Defendant contends that the trial court erred in denying his motion to suppress test results of a blood sample taken without his consent and against his active resistance but pursuant to a search warrant issued on probable cause.

¶ 2 We hold that neither Arizona Revised Statutes Annotated ("A.R.S.") section 28–1321(D)(1) (1998),[1] which allows the taking of blood for alcohol content testing under authority of a search warrant, nor the Fourth Amendment preclude the use of reasonable force to overcome defendant's resistance to the execution of a warrant for the extraction of blood. Further, the trial court did not err in concluding that the force applied here was objectively reasonable. We therefore affirm the convictions and sentences imposed.

## I. FACTS AND PROCEDURAL HISTORY

¶ 3 Officer Steven Raz stopped defendant after clocking his pickup truck being driven at fifty-two miles per hour in a thirty-five

mile-per-hour zone. When Officer Raz approached the truck, he detected the odor of alcohol and noted defendant's "glazed stare." The officer also observed defendant's difficulty in extracting his driver's license from his wallet.

¶ 4 When the officer asked defendant to step out of the truck, he stated that he could not. Officer Raz repeated his request three times before defendant complied. Once out of the truck, defendant held onto it to maintain his balance. Officer Raz administered field sobriety tests, which defendant failed.

¶ 5 Officer Raz then advised defendant of the implied consent law and asked him if he would submit to a blood alcohol test. Defendant responded, "I adhere to my rights." Officer Raz again advised defendant of the law and said that he would seek a search warrant if defendant did not consent to the blood test. When defendant stated that he would adhere to his rights, he was transported to the police station.

¶ 6 At the station, Officer Raz obtained a telephonic search warrant authorizing him to draw a sample of defendant's blood. Officer Raz then served defendant with the search warrant, but defendant refused to submit to the blood test. Several officers then restrained defendant on the floor so that a phlebotomist could draw blood.[2] The blood drawn at 8:15 a.m. showed a blood alcohol level of .19.

¶ 7 Defendant moved to suppress the blood test results. After holding a pretrial trial hearing, the trial court denied the motion. The jury convicted defendant on both counts of aggravated DUI.

## II. DISCUSSION

### A. Section 28–1321(D)(1) Permits Extraction of Blood Pursuant to a Search Warrant

■ ¶ 8 We review the trial court's ruling on a motion to suppress for clear and mani-

1. At the time of the offense, A.R.S. § 28–691 (Supp.1995) governed refusal to submit to a test. Because it has been renumbered as section 28–1321, we refer to the latter throughout this opinion.

2. Officer Raz testified at the suppression hearing that defendant was restrained on the floor. At

trial, however, Officer Raz testified that defendant was restrained in a chair. *See State v. Moore,* 183 Ariz. 183, 186, 901 P.2d 1213, 1216 (App.1995) (we look only at the evidence before trial court at the suppression hearing and view it most favorably to upholding trial court's ruling).

fest error. *See State v. Spreitz,* 190 Ariz. 129, 145, 945 P.2d 1260, 1276 (1997). Defendant here does not dispute that the search warrant was properly issued on probable cause, but he first contends that no statute expressly authorized the seizure of his blood when he actively resisted its taking and thus that the trial court erred in denying his motion to suppress.

▮ ¶ 9 In interpreting statutes, we choose a sensible rather than absurd construction, and when possible, one that furthers the legislative purpose. *See State v. Flores,* 160 Ariz. 235, 239, 772 P.2d 589, 593 (App.1989). We also consider the policy behind the law and the evil it was intended to remedy. *See Carrow Co. v. Lusby,* 167 Ariz. 18, 21, 804 P.2d 747, 750 (1990).

¶ 10 To understand the context of defendant's claim, we recount a partial history of our implied consent law. In 1984, A.R.S. § 28–691 provided that any person operating a motor vehicle within this state arrested for driving while under the influence of intoxicating liquor consented to a test or tests of his blood, breath, or urine to determine the alcohol content of his blood. If the arrested person refused to submit to a test selected by the law enforcement agency, no test could be given except pursuant to section 28–692(M). The latter section provided that if police had probable cause to believe the suspect had violated the law and a blood sample was taken "for any reason a portion of that sample shall be provided to a law enforcement officer if requested for law enforcement purposes." A.R.S. § 28–692(M).

¶ 11 Our supreme court held that this statutory exception allowed the warrantless removal of blood only on a showing of either probable cause or exigent circumstances and when the blood was drawn for medical purposes by medical personnel. *See State v. Cocio,* 147 Ariz., 277, 284, 709 P.2d 1336, 1345 (1985). The court continued to hold that the exception was narrow and specific, even

when it frustrated efforts to obtain blood alcohol evidence. For example, in *Collins v. Superior Court,* 158 Ariz. 145, 761 P.2d 1049 (1988), a person suspected of driving under the influence refused to submit to a breath test, but no blood was drawn for medical purposes. The police then obtained a search warrant and, pursuant to the warrant, a blood sample. *Id.* at 146, 761 P.2d at 1050. Because the blood was not obtained for medical purposes, however, the court held that the evidence must be suppressed. *Id.* at 146–47, 761 P.2d at 1050–51.

¶ 12 In what obviously was a response to the court's holding in *Collins,* the legislature amended the statute in 1990. The 1990 amendment significantly changed the statutory consequences of a refusal to take the test chosen by the law enforcement agency. The 1990 amendment provides that if an arrested person refuses to submit to the designated test, *"the test shall not be given, except . . . pursuant to a search warrant."* See Ariz. Sess. Laws 1990, ch. 375, § 7 (emphasis added). Thus, when a DUI suspect refuses to take the chosen test, section 28–1321(D), as the statute is now numbered, effectively gives police an option.[3] They may either obtain with probable cause a sample of blood drawn for another reason, as for example, blood drawn for a suspect's medical treatment, or they may draw a suspect's blood pursuant to a search warrant.

¶ 13 We acknowledge, however, that section 28–1321(D) does not expressly authorize forcible taking of blood under authority of a warrant. The dissent accordingly reads a negative implication into the statute and would avoid the Fourth Amendment question. This reading, however, renders the statute effective only when a DUI suspect is willing to comply, in which case a warrant is largely superfluous, and renders the statute completely ineffective when a suspect simply refuses to submit to blood alcohol testing.

**3.** Relying on *Nelson v. City of Irvine,* 143 F.3d 1196 (9th Cir.1998), the defendant argues that the state cannot insist on a blood test when it could have administered a breath test. This argument has no merit. Section 28–1321(A) allows the law enforcement agency to designate the test. By contrast, California has allowed the

suspect to choose the type of test he will take. *See* Cal. Vehicle Code § 23157 (West 1997). In *Nelson,* because the defendant offered to give a breath sample, which would give the state evidence of guilt or innocence, the court held the forcible extraction of blood unreasonable. *See* 143 F.3d at 1207.

¶ 14 The dissent also derives from the "consent aspect" of the implied consent law a legislative intent to assure uncooperative suspects that no physical force would be used, *citing Campbell v. Superior Court,* 106 Ariz. 542, 547, 479 P.2d 685, 690 (1971), and *Sherrill v. Department of Transportation,* 165 Ariz. 495, 498, 799 P.2d 836, 839 (1990). Since those cases were decided, however, the legislature has enacted and amended a number of statutes that both increase the penalties on offenders and ease the state's burden of proving intoxication. *See State v. Rodriguez,* 173 Ariz. 450, 453, 844 P.2d 617, 620 (App.1992) (1990 amendments governing admission of intoxilyzer results are to simplify DUI convictions); *State v. Superior Ct. (Ryberg),* 173 Ariz. 447, 450, 844 P.2d 614, 617 (App.1992) (same); *Koller v. Arizona Dep't of Transp.,* 195 Ariz. 343, 988 P.2d 128, 133, ¶ 25 (App.1999) (section 28–1321(D)(1)'s amendment and other changes are to increase criminal penalties and facilitate criminal prosecutions) (citing H.B. 2433, 39th Leg., 2d Reg. Sess. (Ariz.1990), Minutes of the Judiciary Committee, February 21, 1990).

¶ 15 This heightened legislative effort since *Sherrill* and *Campbell* to remove drunk drivers from our highways is a clear indication of a legislative policy shift. No longer is simple revocation of a driver's license for failure to consent to a chemical test a sufficient sanction. *See Koller,* 195 Ariz. at 348, 988 P.2d at 133, ¶ 25. Thus, in view of the changes in the implied consent law since *Sherrill* and *Campbell,* we conclude that section 28–1321(D)(1) clearly indicates that the legislature intended to allow the use of reasonable force to overcome resistance to execution of a search warrant for the removal of blood.

¶ 16 Our conclusion is consistent with the general law governing seizures of evidence pursuant to a warrant. A search warrant is a court order that authorizes police to intrude into an individual's privacy. Notwithstanding the sanctity of one's home, one cannot thwart execution of a warrant by simply barring the door and refusing entry. *See State v. Sanchez,* 128 Ariz. 525, 528, 627 P.2d 676, 679 (1981) (homeowner had no right to prevent officer with a valid warrant from entering his home); *State v. Hatton,* 116 Ariz. 142, 148, 568 P.2d 1040, 1046 (1977) (no right to resist a warrant exists, even if the warrant is later found illegal).

¶ 17 Further, an officer denied entry may use reasonable force to execute a search warrant. *See* A.R.S. § 13–3916(B) (1989) (officer may break into a building or vehicle if, after announcing his presence and authority, he does not receive a response within a reasonable time). To resist execution of a search warrant is itself a crime. *See* A.R.S. § 13–2402 (1989) ("using or threatening to use ... physical force" to obstruct "performance of a governmental function by a public servant acting under color of his official authority" is a misdemeanor).

¶ 18 The dissent finds it significant that the legislature has not addressed the use of force in the execution of a warrant to withdraw blood, while specifically permitting the use of force in the execution of arrest warrants and residential search warrants. Thus, argues the dissent, had the legislature intended to permit force to overcome resistance to a blood draw, it would have said so.

¶ 19 We conclude, however, that implicit in the legislature's grant of authority for a search warrant to withdraw blood for evidence is the authority to use reasonable force to obtain it, and that no specific statutory authorization is required. Otherwise, following the dissent's argument, police could not search a resisting suspect's person for drugs or contraband pursuant to a lawful search warrant because no Arizona statute specifically permits the use of reasonable force to overcome the suspect's resistance. Service of every search warrant involves an official intrusion into areas in which individuals have a reasonable expectation of privacy. It follows that each such intrusion involves some force—actual or constructive. The question is not whether force is permitted, but whether the force used is reasonable.

¶ 20 Our supreme court long ago permitted the use of reasonable force in overcoming resistance to a warrantless search of a person. In *State v. Lewis,* 115 Ariz. 530, 532–33, 566 P.2d 678, 680–81 (1977), while one officer applied a choke hold to prevent a suspect from swallowing a balloon of heroin, another

slapped her on the back. After struggling for several minutes, the police forced the suspect to cough up the evidence. *Id.* at 532, 566 P.2d at 680. The court found that the amount of force was no more than "reasonably necessary" and did not "shock the conscience." *Id.* at 533, 566 P.2d at 681. *See also United States v. Bullock,* 71 F.3d 171, 177 (5th Cir.1995) (suspect's refusal to comply with a search warrant created need for forceful execution but does not entitle him to exclusion of the evidence sought).

¶ 21 Further, *State v. Berg,* 76 Ariz. 96, 259 P.2d 261 (1953), *overruled in part on other grounds by State v. Pina,* 94 Ariz. 243, 383 P.2d 167 (1963), does not compel a conclusion that force cannot be used to draw blood. *Berg's* statement that a defendant's person may not be invaded has been superseded by section 28–1321(D)(1), which allows invasion with a warrant. Further, the *Berg* court stated that if a defendant obstructed police, police could use reasonably necessary force to overcome that resistance. 76 Ariz. at 102, 259 P.2d at 265.

¶ 22 The dissent cites a commentator who has noted that some law enforcement agency policies restrict the use of force when a suspect refuses to give blood. *See* Robert Brooks Beauchamp, *"Shed Thou No Blood": The Forcible Removal of Blood Samples from Drunk Driving Suspects,* 60 S. Cal. L.Rev. 1115, 1118 (1987). The author also concedes that some states have allowed police to use force to obtain blood alcohol evidence, although he suggests that some other forms of legal compulsion are preferable. For example, a state could increase the penalty for refusing a chemical test to equal that of a conviction, or it could make refusal itself a crime with equally dire consequences. *Id.* at 1136–39. Our legislature has not chosen these options, but it has given police officers an additional method, secured only after application to a neutral magistrate, to aid in detecting and removing impaired and dangerous drivers from our streets and highways.[4]

¶ 23 Nothing in A.R.S. § 28–1321(D) suggests that those DUI suspects who are most uncooperative or belligerent, and probably most impaired, can avoid giving crucial evidence simply because they choose not to. This approach would effectively place the DUI suspect in control of the giving of blood evidence and might well encourage violence and unlawful behavior. As a California court held, "[a]bsent a clear legislative mandate giving a defendant absolute control of whether a blood alcohol test may ·be obtained, the lack of such evidence should not turn on the degree of a defendant's cooperation with a premium given to the more obstreperous drunk driver who is more successful in forcibly resisting the withdrawal of a blood sample." *Carleton v. Superior Court,* 170 Cal. App.3d 1182, 1191, 216 Cal.Rptr. 890 (1985).

¶ 24 Finding no prohibition in the statute to taking evidence by reasonable force and analogous authority in forceful execution of search warrants for places, we next turn to defendant's claim that a forceful taking of his blood was an unconstitutional and unreasonable search.

### B. Fourth Amendment Does Not Prohibit Use of Force to Overcome Defendant's Resistance to Execution of the Warrant

¶ 25 All agree that taking blood is a seizure subject to the Fourth Amendment. The United States Supreme Court in *Schmerber v. California,* 384 U.S. 757, 771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), held that blood alcohol evidence could be taken without a DUI suspect's consent and without a warrant. The police had requested a blood sample, and over the suspect's verbal objection, a doctor drew a sample. The evidence was admitted at trial and established the suspect's intoxication. *Id.* at 758–59, 86 S.Ct. 1826.

¶ 26 The Court relied on *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d

---

4. The commentator also suggests that allowing seizure of blood alcohol evidence on authority of a search warrant in felony drunk driving cases, when a more compelling need for the evidence exists, "assumes the potential use of force."

Nevertheless, he asserts that use of a warrant is preferable to allowing police officers alone to decide whether a seizure is justified. *Id.* at 1136, 1140.

448 (1957), in which it had upheld a DUI conviction after police asked a doctor to draw blood from the unconscious and unconsenting suspect. Interestingly, it also cited Justice Warren's *Breithaupt* dissent, which had declared that for due process purposes, whether one verbally objected *or physically resisted* the taking made no difference as long as the police did not initiate violence or respond with "inappropriate force." 384 U.S. at 760 n. 4, 86 S.Ct. 1826 (quoting *Breithaupt*, 352 U.S. at 441, 77 S.Ct. 408 (Warren, C.J., dissenting)).

¶ 27 The Court acknowledged the Fourth Amendment's purpose in protecting "personal privacy and dignity" and recognized that physical intrusions differ from those into a house, personal papers, or other property. *Id.* at 767, 86 S.Ct. 1826. But, "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Id.* at 768, 86 S.Ct. 1826. The Court found that when probable cause and exigent circumstances existed, no warrant was required to take the blood. *Id.* at 770–71, 86 S.Ct. 1826.

¶ 28 The Court additionally considered whether the test method was reasonable and concluded that blood testing is "highly effective" in determining blood alcohol content;[5] that such tests were "commonplace," and "for most people ... involve[ ] virtually no risk, trauma, or pain." *Id.* at 771, 86 S.Ct. 1826. Finally, the testing was done in a hospital by a physician, and thus the manner of giving the test was reasonable. *Id.*

¶ 29 In a later case involving a state request that a robbery suspect undergo surgery and general anesthesia to allow a search for a bullet in his chest, the Court reached a different conclusion. *See Winston v. Lee*, 470 U.S. 753, 755, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). The Court considered the threat to the suspect's health and safety, the degree of the intrusion, and society's need for the evidence in a fair determination of guilt or innocence. *Id.* at 761–62, 105 S.Ct. 1611.

When the health threat of surgery and general anesthesia was uncertain, the degree of intrusion more severe than the blood extraction in *Schmerber*, and other substantial evidence bearing on guilt or innocence existed, the Court found the intrusion unreasonable. *Id.* at 765–66, 86 S.Ct. 1826.

¶ 30 The Supreme Court's balancing test for determining the reasonableness of a physical intrusion for taking blood through medically approved means is well established by the above precedent. And although the Court has not directly addressed whether a suspect's forceful resistance alters the balance, it concluded in *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that the Fourth Amendment reasonableness test applies to civil rights claims alleging use of excessive force in an arrest, stop, or other personal seizure.

¶ 31 In addition, at least two Federal Circuit Courts of Appeal have considered the use of force to overcome resistance to giving blood samples. In *Bullock*, a robbery suspect was arrested and detained while police obtained a search warrant for blood and hair samples. 71 F.3d at 174. The defendant resisted the seizures. *Id.* After seven officers subdued him, he was "cuffed and shackled" between two cots strapped together and had a towel applied to his face because he was not only kicking and hitting but spitting and attempting to bite. *Id.*

¶ 32 The Fifth Circuit, applying *Schmerber*, found no Fourth Amendment violation: the procedure did not threaten the suspect's health or safety; the methods for taking blood and hair samples were medically sound; and the use of force, occasioned by defendant's own refusal, was reasonable under the circumstances. *Id.* at 176. Additionally, the need for the scientific evidence in light of other, less persuasive evidence was great. *Id.* at 176–77.

¶ 33 In the context of a DUI suspect's damages suit for use of excessive force in the taking of blood, the Ninth Circuit assumed "that *Schmerber* does not preclude the use of

---

5. Our courts have similarly recognized that blood alcohol evidence is critical and often dispositive in DUI cases. *See Scales v. City Court,*

122 Ariz. 231, 234, 594 P.2d 97, 100 (1979) (blood alcohol content may be "crucial" in ascertaining intoxication).

force in some circumstances to extract a blood sample from a resistant suspect." *Hammer v. Gross*, 932 F.2d 842, 845 (9th Cir.1991) (en banc). The question in *Hammer*, however, was whether a jury could have found that handcuffing the suspect to a hard plastic chair and holding him down while a technician took the blood constituted excessive force by the police. *Id.* at 844–45. In a divided opinion, four judges concluded that the reasonableness of the officer's action was a jury question and thus that the district court did not err in denying the defendants' motion for directed verdict or judgment notwithstanding the verdict. *Id.* at 846.

¶ 34 Five of the eleven judges dissented on the ground that *Schmerber* clarified that even a search warrant is not needed "if extraction is necessary to preserve evanescent evidence," *id.* at 854, and that "[i]t is also clear that the police are entitled to use some physical force in order to successfully extract the blood sample. Therefore, the fourth amendment did not prohibit [the police] from using some force to extract blood...." *Id.* (citation omitted).

¶ 35 The dissenters and majority agreed, moreover, that a state law requiring suspension of a driver's license for refusal to consent to a blood test did not alter the analysis. *Id.* at 848, 854. The argument that adoption of the mandatory suspension rule showed a legislative intent to bar use of *any* force was contrary to California case law and "ha[d] little to recommend it as a matter of federal constitutional law." *Id.* at 848.

### C. The Degree of Force

■ ¶ 36 The use of force by police requires swift judgments under difficult circumstances, and in recognition of this, the Supreme Court in *Graham* clarified that claims of excessive force are analyzed under a " 'reasonableness' standard." *Id.* at 395, 109 S.Ct. 1865. The nature and degree of the intrusion are balanced against the governmental interest in securing the evidence. *See* 490 U.S. at 396, 109 S.Ct. 1865. But, the balance also considers the "severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Id.* Although review of police conduct should not be evaluated with "20/20 hindsight" and does not consider an officer's subjective intent, the conduct still must be objectively reasonable under the circumstances. *Id.* at 396, 109 S.Ct. 1865.

■ ¶ 37 This record supports the trial court's balancing of the *Graham* factors. Defendant's offense was serious: aggravated DUI is a class 4 felony. His active resistance by moving his arms and legs to frustrate the withdrawal of his blood exposed the officers and phlebotomist to the obvious dangers of an inadvertent needle stick or uncontained blood. Further, defendant had no right to resist service of a court order authorizing extraction of his blood, and he had several occasions to voluntarily submit to the test. When he refused to do so, he left the officers no alternative but to overcome his resistance with reasonable force.

¶ 38 We find no clear and manifest error in the trial court's ruling on the motion to suppress. In determining that the search was objectively reasonable, the trial court weighed the countervailing governmental interests, that is, the effectiveness of the blood alcohol testing and its vital importance to enforcement of drunk driving laws. Furthermore, because the force employed, viewed objectively by a reasonable officer under the circumstances, was reasonable, the trial court did not err in finding that these officers properly employed force to overcome physical resistance. *See Graham*, 490 U.S. at 397, 109 S.Ct. 1865.

CONCURRING: SARAH D. GRANT, Judge.

FIDEL, Presiding Judge, dissenting.

¶ 39 The investigating officer, explaining his insistence upon blood testing rather than breath testing, stated, "We do blood in the City of Mesa." To do defendant's blood, six or seven police officers struggled for almost half an hour to immobilize him on the stationhouse floor [6] while a phlebotomist jabbed a

---

6. Although defendant recalled being held down

in a chair, Officer Raz testified that the police

needle repeatedly into the back of his left hand. According to the police, the defendant was neither aggressive nor violent; he was not swinging or punching or kicking; he simply refused to hold still. His resistance, however, caused the phlebotomist to lose "vacuum" in the needle, and necessitated many punctures before he could extract the desired two vials of blood. The next day, defendant's hand was swollen to the size of a grapefruit and he lacked use of his thumb.

¶ 40 This is not an evidence-gathering technique that citizens who value liberty should contemplate in comfort. Nor is it one we should assume the police, who lack clear lines of guidance, are eager to employ. In the "very few states [that] allow the use of reasonable force, at the discretion of the arresting officer, .... many law enforcement agencies severely restrict, by department policy, the use of force to secure evidence from within the suspect's body in drunk driving cases," reserving such force for cases of death or serious physical injury. NOTE, *"Shed Thou No Blood": The Forcible Removal of Blood Samples from Drunk Driving Suspects,* 60 S. Cal. L.Rev. 1115, 1118 (1987) [hereinafter *Forcible Removal* ]. This restraint on the part of police authorities may reflect in part a desire to reserve for the most serious cases a. practice risky to the police themselves. *See infra,* ¶ 47.

¶ 41 The majority, expanding *Schmerber* and the Fourth Amendment case law, holds forcible blood extraction routinely and constitutionally permissible. I find that the practice is not statutorily permissible, and I regard the constitutional questions addressed by the majority as unnecessary and undesirable to reach. *See State v. Yslas,* 139 Ariz. 60, 63, 676 P.2d 1118, 1121 (1984) (the court should refrain from addressing constitutional questions unless to do so is indispensable to decision.). Analysis should start with the statutes that permit the police to gather chemical evidence of driving while intoxicated. That is also where analysis should end.

decided to "take him down to the floor where it was the safest place to obtain the blood."

7. As of the time of trial, the subsection currently designated 28–1388(E) was designated 28–

¶ 42 Our implied consent statute, A.R.S. § 28–1321, both authorizes the gathering of chemical evidence and addresses what shall follow upon a suspect's "refusal to submit to the test." The statute is headed, "Implied consent; tests; *refusal to submit to test;* order of suspension; hearing; review; temporary permit; notification of suspension." (Emphasis added.) The statute penalizes, and attempts to deter, refusal by imposing a twelve-month suspension of the suspect's driver's license. *See* A.R.S. § 28–1321(B)(D)(2). The statute further states:

If a person under arrest refuses to submit to the test designated by the law enforcement agency as provided in subsection A of this section:

1. *The test shall not be given,* except as provided in § 28–1388, subsection E or pursuant to a search warrant.

A.R.S. § 28–1321(D)(1) (emphasis added).[7] Section 28–1388(E) states in turn:

Notwithstanding any other law, if a law enforcement officer has probable cause to believe that a person has violated § 28–1381 and a sample of blood, urine or other bodily substance is taken from that person for any reason, a portion of that sample sufficient for analysis shall be provided to a law enforcement officer if requested for law enforcement purposes.

A.R.S. § 28–1388(E).

¶ 43 When it comes to nonconsensual blood withdrawal, our implied consent law has a prohibitive, not permissive, thrust: with two exceptions the "warrant exception" contained in section 28–1321(D)(1) and the "medical purpose exception" contained in section 28–1388(E)the Arizona legislature has prohibited the police from engaging in a nonconsensual taking of blood.

¶ 44 The medical purpose exception is not implicated in this case, though its narrow terms confirm the legislature's measured and restrictive approach to the nonconsensual taking of blood. *See infra* ¶¶ 51–53. The warrant exception, which is implicated in this

1381(O), and subsection 28–1321(D)(1) made reference thereto. The statutes were renumbered by 1998 amendment, and I have used the current numbering in the text.

case, authorizes a police officer to initiate a nonconsensual taking of a suspect's blood upon a magistrate's finding of probable cause. The statute is silent, however, on the use of force.

¶ 45 The majority construes the statute's silence as a tacit endorsement of police force in execution of the warrant. The majority bases this conclusion in part upon the legislature's longstanding and explicit approval of police force to overcome resistance to a residential search warrant. *See* A.R.S. § 13–3916(B).[8] The majority reasons that if reasonable force is permissible to overcome an individual's resistance to the search of a residence, such force is permissible to overcome resistance to a blood draw.

¶ 46 I disagree, for both physical and textual reasons, that the latter proposition follows from the former. Taking physical reasons first, there is a qualitative difference between intrusion into the residence of a suspect and "surgical intrusion[ ] beneath the [suspect's] skin." *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). The latter, the Supreme Court has recognized,

> implicate[s] ... most personal and deep-rooted expectations of privacy, and ... Fourth Amendment analysis thus require[s] a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable.

*Id.*; see also *Schmerber,* 384 U.S. at 767, 86 S.Ct. 1826 (contrasting "intrusions into the human body" with "state interferences with property relationships or private papers").

¶ 47 There is likewise a substantial difference in the force required to enter a residence and the force required "to restrain an accused to the degree necessary to allow a needle to be inserted into [and maintained within] a vein." *Forcible Removal,* 60 S. Cal. L.Rev. at 1133. The present case demonstrates not only the sustained and bruising force that may be needed to overcome resistance to a blood withdrawal, but also the substantial risk entailed, and not to the suspect alone: in the extended struggle to restrain this defendant, six or seven police officers faced a risk of puncture by the needle that repeatedly was thrust into defendant's hand. Asked to explain his assertion that defendant was a threat to police safety, Officer Raz stated, "Because we had open needles."

> [F]orce under such circumstances is difficult to control.... There can be no doubt that the episodes occurring between the resistive drunk and the police officer attempting to secure a blood sample by means of "reasonable force" are likely to be dangerous, unpleasant, undignified, and undesirable from the standpoint of all concerned.

*Id.* In a time of intense public concern over the spread of infectious disease by blood-contaminated needles, we should not assume that our legislature has chosen by its silence to expose the police to such a risk.

¶ 48 Turning to textual analysis, there are sound reasons to conclude that the legislature has not made such a choice. In A.R.S. § 13–3916(B), the legislature addressed itself expressly to the forcible execution of a residential search warrant. Similarly, in A.R.S. § 13–3881 *et seq.,* the legislature addressed itself expressly to the use of force in accomplishing an arrest.[9] The presence of these statutes on the books makes conspicuous the absence of a statutory counterpart that authorizes the police to engage in forcible blood extraction. When our legislature wants to approve force, it says so. Had the legislature intended to permit force to overcome resistance to a blood draw, we may infer that it would have enacted a specific statute on that subject. It has not done so to date.

---

8. A.R.S. § 13–3916(B) provides:
   An officer may break into a building, premises, or vehicle or any part thereof, to execute the warrant when:
   1. After notice of his authority and purpose, he receives no response within a reasonable time.
   2. After notice of his authority and purpose, he is refused admittance.

9. *See, e.g.,* A.R.S. § 13–3881 ("Arrest; how made; force and restraint"); § 13–3887 ("Method of arrest by officer by virtue of warrant"); § 13–3888 ("Method of arrest by officer without warrant"); § 13–3891 ("Right of officer to break into building").

¶ 49 Not only does the majority construe legislative silence in this instance as an uncharacteristically tacit grant of police power to use force; the majority also construes legislative silence as a tacit repudiation of our supreme court's longstanding attribution of a contrary purpose to the informed consent law. Almost thirty years ago, the court approved mandatory license suspension as a device intended to "assure[ ] that no physical violence will be directed against a person who refuses [to provide] ... chemical evidence" and to "minimize[ ] the risk that conduct which would 'shock the conscience of the court' will occur." *Campbell v. Super. Ct.,* 106 Ariz. 542, 547–48, 479 P.2d 685, 690–91 (1971). Nine years ago the court reiterated that the purpose of mandatory suspension is to "assure[ ] that no physical violence or coercion will occur against a person who is noncooperative." *See Sherrill v. Dep't of Transp.,* 165 Ariz. 495, 498, 799 P.2d 836, 839 (1990).

¶ 50 Our supreme court has said nothing since *Campbell* and *Sherrill* to suggest that it deems this purpose now inoperative. Nor can this court reasonably attribute a repudiation of that purpose to the two amendments that the legislature has enacted to the informed consent law to date.

¶ 51 As originally enacted, the implied consent statute provided without exception that if a suspect refused to undergo a test, none would be given. 1969 Ariz. Sess. Laws, Ch. 41, § 1. In 1984, the legislature amended the statute to add the medical purpose exception. 1984 Ariz. Sess. Laws, Ch. 257, § 1. Maintaining its restrictive approach to nonconsensual blood extraction, however, the legislature did not expand police powers to the full extent that the Fourth Amendment has been interpreted to permit. That is, in *Schmerber v. California,* the Supreme Court had approved a non-consensual blood draw performed by a physician upon police request. 384 U.S. at 758, 86 S.Ct. 1826. In enacting the medical purposes amendment, however, the Arizona legislature did not authorize the police to *initiate* a nonconsensual taking of a suspect's blood, but only to demand part of a sample that medical personnel had chosen to take for independent medical needs. *See State v. Cocio,* 147 Ariz. 277, 286, 709 P.2d 1336, 1345 (1985). Upholding the statute, our supreme court emphasized its modest impact:

> The blood extraction was *not* performed at the request of the police, but pursuant to the orders of the attending physician for medical purposes. Thus, the intrusion by the police in this case was not the needle puncture and the insertion of the needle into the vein, but merely a sampling off of an additional portion of the defendant's blood.

*Id.* at 286–87, 709 P.2d at 1345–46.

¶ 52 The supreme court reiterated the narrowness of the medical purposes exception in *Collins v. Superior Court,* holding that the implied consent statute did not even authorize police to obtain a warrant for the seizure of blood from drunk driving suspects. 158 Ariz. 145, 146, 761 P.2d 1049, 1050 (1988). In response, the legislature again amended the statute, expressly authorizing the police to seek a warrant for the taking of blood. 1990 Ariz. Sess. Laws, Ch. 375, § 7.

¶ 53 This statutory history of narrow, incremental change does not support the conclusion that the legislature has decided *sub silentio* to repudiate three decades of judicial interpretation and to endorse the use of physical coercion to accomplish the extraction of blood. That is too significant a decision, and too substantial a change in course, to be left to implication. It is more reasonable, and more consistent with the interpretive history of the statute, to read the warrant exception as intended instead to offer police an additional, non-violent instrument of compulsion. *See, e.g., United States v. Cameron,* 538 F.2d 254, 259 (9th Cir.1976) (one purpose a warrant may serve is to help secure the cooperation of a reluctant suspect).

¶ 54 The majority points out that a defendant who forcibly resists the execution of a warrant for blood withdrawal is subject to criminal prosecution under A.R.S. § 13–2402. *See supra* ¶ 17.[10] The majority also invokes

---

**10.** The majority might have added that one who refuses to comply with a warrant is subject to

the legislative effort over recent years to ease the state's burden of proving intoxication. *See, e.g.,* A.R.S. § 28–1388(D) (permitting evidence of refusal to submit to blood alcohol testing to be admitted in any civil or criminal proceeding). Such provisions and penalties, however, underscore my point. By various measures of non-violent compulsion, the legislature has undertaken to discourage and penalize the refusal to cooperate with blood testing. What the legislature has not yet done, however, is specify whether, and under what conditions, the police should be permitted to undertake blood withdrawal by force.

¶ 55 There are sound policy reasons to leave it to the legislature to amend the statute once again if it wishes to authorize the forcible execution of blood warrants. In deciding whether, and under what circumstances, to permit such a practice, a legislature must balance individual privacy interests against the needs of law enforcement, consider the adequacy of present means and devices to induce consent, consider the various risks that force entails, and determine what, if any, circumstances warrant such risks. Some legislatures, after conducting such an inquiry, have declined to permit any forcible extraction of blood. *See, e.g.,* KY.REV.STAT. ANN. § 189A.105(1) (Michie 1997); Mo. ANN. STAT. § 577.041(1) (West 2000); MONT.CODE ANN. § 61–8–402(4) (1999); *see also Forcible Removal,* 60 S. CAL. L.REV. at 1119 (describing "overwhelming consensus disfavoring the removal of blood evidence from within the body of [a] drunk driving suspect[ ] by force"). Others have permitted reasonable force, but only with probable cause to believe that the intoxicated driver has caused death or serious bodily injury. *See, e.g.,* FLA. STAT. ch. 316.1933 (1999); HAW.REV. STAT. §§ 286–151.5 & 286–163(a) (1998); N.Y. VEHICLE & TRAFFIC LAW § 1194(3)(b)(1) (McKinney 1996). Given the historically restrictive thrust of our implied consent stat-

ute, we should await deliberate and specific guidance from the legislature before concluding that it has approved the forcible extraction of blood.

¶ 56 Such guidance would not only benefit the courts by narrowing the focus of eventual constitutional inquiry; it would also greatly aid the police in formulating policy on the subject. There was testimony in this case that the Mesa Police Department lacked any policy to guide its officers concerning force to overcome resistance to a blood-withdrawal warrant. A statute that emerged from a legislative balancing of risks and benefits and interests would give police far better guidance than the ad hoc, case-by-case analysis that courts employ under the federal constitutional standard. *See, e.g., Winston v. Lee,* 470 U.S. at 760, 105 S.Ct. 1611 ("The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure.").

¶ 57 Because I find no statutory basis for the forcible blood withdrawal in this case, I would not reach the constitutional issue upon which the majority bases its decision. I wish to comment, though, on the sweeping nature of the majority's constitutional analysis.

¶ 58 The Supreme Court has not to date considered or upheld a forcible withdrawal of blood from a drunk driving suspect.[11] But the Court has called for case-by-case analysis of the reasonableness of involuntary evidentiary incursions beneath the skin. *Id.* Yet my colleagues, eschewing such analysis, give no weight to the particular circumstances of this case; rather, they approve the forcible execution of any blood withdrawal warrant, no matter what the circumstances of the case.

¶ 59 As I have noted, some state legislatures and police agencies have limited forcible blood withdrawals to cases involving death or serious injury. This criterion may

contempt prosecution as well.

**11.** In *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), the Court upheld the warrantless seizure of a blood sample from an unconscious driver following a collision. In

*Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Court upheld the warrantless seizure of a blood sample from a conscious driver who refused consent but did not physically resist.

be pertinent to judicial analysis as well. What the Constitution may accommodate as reasonable in one circumstance may not be reasonable in another. *See Winston v. Lee,* 470 U.S. at 763, 105 S.Ct. 1611 (state's need for evidence should be balanced against the extent of the intrusion); *see also id.* at 760, 105 S.Ct. 1611 (determination of reasonableness is "a delicate one admitting of few categorical answers"). Here, there was no death, no injury, and no collision. Defendant, pulled over for speeding, was patently intoxicated. His speech was slurred, his eyes were blurred, he flunked the field sobriety tests, he smelled of alcohol, and he could not stand without support. This abundant existent evidence of intoxication should be relevant to a case-specific examination of the reasonableness of forcible blood extraction. The majority, however, sweeps case-specific inquiry aside in favor of a blanket and permissive constitutional rule.

¶ 60 In summary, I believe that my colleagues have taken a mistakenly broad and categorical approach to a constitutional issue that we ought not reach at all. Because our legislature has not authorized police to employ force in execution of a warrant for the taking of blood, there is no need to determine the circumstances, if any, under which such force might constitutionally be employed. Finding that the police exceeded their statutory authority with their blood seizure in this case, I respectfully dissent.