**2019 UT App 145**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DOUGLAS DWAYNE EVANS,
Appellant.

Opinion
No. 20170340-CA
Filed August 22, 2019

Third District Court, Salt Lake Department
The Honorable Ann Boyden
No. 141906586

Herschel Bullen, Attorney for Appellant

Sean D. Reyes, Nathan D. Anderson, and Karen A.
Klucznik, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

HARRIS, Judge:

¶1    A jury convicted Douglas Dwayne Evans of murdering a
man (Victim) he suspected was intimately involved with his
fiancée (Fiancée). Evans appeals, arguing that the trial court
erred by denying his motion to suppress the results of a DNA
sample taken from him by force he contends was unreasonable,
and arguing that his trial attorney provided ineffective
assistance by failing to object to certain evidence. We find
Evans's arguments unpersuasive, and therefore affirm.

BACKGROUND[1]

¶2     Evans and Fiancée were engaged to be married, but had a relationship that Fiancée described as difficult and argumentative. Each of them had on various occasions accused the other of infidelity, and Evans was apparently particularly jealous of Fiancée's relationship with forty-nine-year-old Victim, whom Fiancée considered a long-time family friend. About ten days before the murder, Evans composed a letter to Fiancée—that he never sent or delivered—in which he wrote, among other things, that he could not "imagine someone [else] touching [her]" and that if he learned such activities were occurring he did not "know what [he] would do." A few days later, Evans sent a series of text messages to Fiancée in which he was more explicit, stating that he knew that it was Victim's "old ass [she had] been going to see sneaky" and that he intended to go "on a ram page" and that he "know[s] where dat old f[***] [Victim] live[s]." He made clear that he had previously warned Fiancée: "I told u u cheat u die it was ur choice u chose." One of his last text messages to Fiancée on the day of the murder contained a picture of a black handgun, and instructed her to "[j]ust please be honest wit me for once, please."

¶3     Somewhat ironically, Evans's anger and jealousy burned hottest upon his return from an overnight trip to Wendover, Nevada with a female friend (Friend). During the trip, Evans had been wearing a red L.A. Angels baseball cap, and he and Friend had traveled to and from Wendover in Evans's silver Infiniti sedan notable for its showy and distinctive metal wheel rims. Late in the afternoon on May 31, 2014, after returning from Wendover earlier that day, Evans drove the same silver sedan into Victim's neighborhood in Kearns, Utah. One of Victim's

---

1. "On appeal, we construe the record facts in a light most favorable to the jury's verdict." *State v. Maestas*, 2012 UT 46, ¶ 3, 299 P.3d 892 (quotation simplified).

neighbors (Neighbor) noticed a silver sedan with "really large" rims parked in front of Victim's house, and observed a man matching Evans's description emerge from the vehicle and start walking toward Victim's house.

¶4      Evans went up to Victim's door and knocked. At the time, Victim was home, accompanied by a female guest (Guest). Guest later testified that, after hearing a knock at the door, Victim left his bedroom to answer it and, although she could not see the door, she heard Victim say "I haven't seen her, I swear." Immediately thereafter, she heard a "loud crack" that "sounded like a doorjamb breaking." She waited a moment before going to the door to investigate, and by the time she got there she saw, out of the front window, a "darker man with longer hair" walking away from the house down the driveway, then get in a silver sedan and drive off. She found Victim lying face down next to the door, his forehead swollen, and not breathing. She saw "blood everywhere" and could smell gunpowder. On the ground next to Victim detectives discovered a red L.A. Angels baseball cap.

¶5      Evans left the scene in the Infiniti sedan, but abandoned the car later that day several miles from the scene of the shooting. He then picked up Friend in a different car—a Cadillac Escalade Evans had previously given to Fiancée as a Mother's Day present—and the two of them drove back to Wendover.

¶6      Guest reported the shooting to police, who began an investigation. Two days later, police arrested Evans, who denied any involvement in the shooting and claimed that he could not have committed the crime because he had been in Wendover at the time. Evans also told police that, a few days earlier, he had lent his Infiniti to either his "lady" or his cousin and had not seen it since. Evans eventually gave an address to police where he thought the Infiniti was located, but the vehicle was not there. Evans then gave a phone number for his cousin to police, but the phone number was no good. In spite of Evans's misinformation, police eventually recovered the Infiniti and found a cell phone

inside, as well as blood on the driver's side door. Police also recovered an additional four cell phones from Evans's Escalade, and later obtained cell site location information (CSLI)[2] for all five phones from the relevant cellular service providers. That information, combined with time-stamped surveillance camera footage from both a hotel and a convenience store in Wendover, allowed police to ascertain Evans's general whereabouts on May 30 and 31. According to that evidence, Evans had indeed been in Wendover overnight on May 30, but had returned to the Salt Lake Valley during the late morning of May 31, before driving back to Wendover later that night. The CSLI also showed that, during the late afternoon of May 31, right around the time of the shooting, Evans had been within 200 meters of Victim's home.

¶7    Investigators also wanted to verify if the red baseball cap found at the crime scene belonged to Evans, and sent the cap to

---

2. The United States Supreme Court recently explained CSLI:

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic. That has led to increasingly compact coverage areas, especially in urban areas.

*Carpenter v. United States*, 138 S. Ct. 2206, 2211–12 (2018).

be analyzed for DNA. Evans refused to voluntarily provide a DNA sample, so investigators sought and obtained a search warrant authorizing them to collect Evans's DNA by using a "buccal swab" technique—essentially, a simple and painless swab of the inside of a person's cheek with a cotton swab. *See State v. White*, 2016 UT App 241, ¶ 4, 391 P.3d 311 (describing a buccal swab). Even after investigators obtained the search warrant and showed a copy of it to him, Evans continued to resist, refusing to open his mouth, and thrashing and kicking at officers attempting to perform the swab. Police then forcibly obtained the DNA sample by handcuffing him, placing him in leg irons and a belly chain, and using "four or five pretty large detectives" to hold him down, employ a "control hold" on one of his wrists, and "hold his mouth" so that a technician could, "through clenched teeth," "get into [Evans's] cheek and do the swab." After testing, that sample conclusively matched the major DNA profile on the baseball cap found at the crime scene; according to the State's DNA expert, the odds that the DNA on the cap belonged to someone other than Evans was 1 in 227,000.

¶8 Based on the evidence it gathered during its investigation, the State eventually charged Evans with three crimes: murder, aggravated burglary, and possession of a dangerous weapon by a restricted person. Prior to trial, Evans filed a motion asking the trial court to suppress the DNA evidence, on the ground that the State had used unreasonable force in obtaining the DNA sample from him. The trial court denied Evans's motion, concluding that "the force that was used was solely in response to [Evans's] efforts to resist the execution of a properly obtained warrant" and was therefore not unreasonable.

¶9 The case proceeded to a five-day jury trial. During its case-in-chief, the State presented testimony from more than twenty witnesses, including Fiancée, Friend, Neighbor, and Guest, who provided testimony about what happened on May 31, 2014; a DNA expert and a CSLI expert, who provided scientific testimony; and two individuals who had met Evans in jail and who both testified that Evans had confessed the murder

to them. In addition, the State presented the unsent letter Evans had written to Fiancée ten days before the shooting, as well as several pre-shooting photographs of Evans standing in front of both the silver Infiniti sedan and the Cadillac Escalade; in some of these photos, Evans was wearing a red L.A. Angels baseball cap, and in three of the photos, Evans is making a distinctive hand gesture. Evans's trial counsel did not object to the admission of the letter or any of the photos, even the three in which Evans was making the hand gesture. The State introduced the photos, at least in part, to demonstrate that Evans possessed the Infiniti and the Escalade, and that he often wore a red L.A. Angels baseball cap; discussion of the photos at trial did not go much beyond those topics, and no witness or attorney ever mentioned the hand gesture, let alone stated or implied that the gesture might be gang-related.

¶10 Evans's attorneys vigorously cross-examined the State's witnesses, but elected not to present any defense witnesses, and Evans did not testify. In cross-examination and argument, counsel emphasized the State's burden to prove guilt beyond a reasonable doubt by calling attention to discrepancies in witness testimony, presenting Evans's relationship with Friend as proof that he no longer cared about Fiancée, and questioning the accuracy of the DNA and CSLI evidence. At the conclusion of the trial, the jury found Evans guilty on all charges.

ISSUES AND STANDARDS OF REVIEW

¶11 Evans now appeals his convictions, and asks us to review two main issues.[3] Evans first asserts that the trial court erred in

_____

3. In his opening brief, Evans also challenged the introduction of the CSLI evidence, based on his belief that it had been obtained without a warrant. In response, the State pointed out that four of the nine search warrants obtained in this case had to do with the various cell phones found in Evans's possession. In his reply

(continued…)

denying Evans's motion to suppress the DNA evidence obtained by means of the buccal swab. "We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. "While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *Id*.

¶12 Evans, through new counsel on appeal, next argues that his trial attorney provided constitutionally ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (quotation simplified).

ANALYSIS

I

¶13 Evans first contends that the trial court erred in denying his motion to suppress the DNA evidence investigators obtained by forcibly swabbing his cheek pursuant to a search warrant. Specifically, he asserts that the search warrant did not—either expressly or impliedly—give police officers the authority to obtain his DNA by means of force, and that even if it did, the force that police officers used to collect the sample was excessive. For the reasons that follow, we find Evans's arguments unpersuasive.

---

(…continued)
brief, Evans withdrew his challenge to the CSLI evidence, and we therefore do not further address this withdrawn argument.

A

¶14   Officers obtained a search warrant to obtain Evans's DNA. That warrant authorized officers to "make a search" of Evans's person, by means of a "[b]uccal swab[]," so that the State could conduct "DNA testing." Evans does not challenge the validity of that warrant, and does not contest the fact that the State had the right to obtain his DNA by means of a buccal swab.

¶15   But Evans does challenge the officers' right to use force in executing the warrant. This particular search warrant did not explicitly authorize the use of "reasonable force" in connection with its execution, nor did it explicitly forbid it; instead, the warrant was silent on the issue. Evans contends that officers executing such a warrant are not authorized to use any kind of force, even reasonable force; indeed, Evans asserts that, in the face of his resistance to the execution of this warrant, officers were required to stand down until they had obtained a second warrant, one that expressly authorized the use of reasonable force. But Evans's position, while energetically offered, is supported by neither law nor policy.

¶16   The United States Supreme Court has made clear that search warrants need not specify the "precise manner in which they are to be executed," and that "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). Indeed, "courts have upheld the use of forceful breaking and entering where necessary to effect a warranted search, even though the warrant gave no indication that force had been contemplated," and there is "[n]othing in the decisions of [the U.S. Supreme Court that] indicates that officers requesting a warrant would be constitutionally required to set forth the anticipated means for execution even in those cases where they know beforehand that unannounced or forced entry likely will be necessary." *Id.* at 257 & n.19; *see also Los Angeles County v. Rettele*, 550 U.S. 609, 616 (2007) ("When officers execute a valid

warrant and act in a reasonable manner to protect themselves from harm . . . the Fourth Amendment is not violated."); *State v. Clary*, 2 P.3d 1255, 1256 (Ariz. Ct. App. 2000) (stating that "the Fourth Amendment [does not] preclude the use of reasonable force to overcome defendant's resistance to the execution of a warrant"); *cf. United States v. Husband*, 226 F.3d 626, 638–40 (7th Cir. 2000) (Easterbrook, J., dissenting) (stating that "every warrant authorizes" the "police to use force to overcome resistance," and that, once the suspect refused the warrant, "the police were entitled to use force" to execute it).

¶17    The law is even more clear in the context of arrest warrants—the United States Supreme Court has held that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *see Graham v. Connor*, 490 U.S. 386, 396 (1989), and even Evans acknowledged, at oral argument before this court, that arrest warrants come complete with implied authority to employ reasonable force, if necessary, in executing them.[4] Both types of warrants—one authorizing a search, the other a seizure—are analyzed under Fourth Amendment[5] standards and

---

4. Indeed, under Utah law, it is a crime to actively resist arrest. *See* Utah Code Ann. § 76-8-305(1) (LexisNexis 2017). In some states, it is also a crime to actively resist execution of a search warrant. *See, e.g.*, *State v. Gonzalez*, 71 A.3d 681, 685 (Conn. App. Ct. 2013) (affirming a conviction for violation of a state statute criminalizing resistance to the execution of search warrants, in a case where the defendant had refused to open his mouth for a buccal swab authorized by a valid search warrant). Utah does not appear to have a specific statute criminalizing resistance to a search warrant; in any event, the State does not contend that Evans violated Utah law by resisting the buccal swab.

5. At various points in his briefing, Evans alludes to the Utah Constitution, noting that Article I, Section 14 sometimes has been

(continued…)

principles, and Evans offers no persuasive rationale why search warrants should be treated any differently than arrest warrants with regard to whether a reasonable force authorization is implied with issuance.[6]

---

(…continued)
construed to provide "a greater expectation of privacy than the Fourth Amendment." But Evans develops this argument no further than a conclusory citation, and makes no reasoned and specific argument for construing our state constitution more broadly in this particular context. Without more fulsome briefing on the question, our supreme court generally refuses to consider state constitutional arguments, *see State v. Fuller*, 2014 UT 29, ¶ 50, 332 P.3d 937 (concluding that a state constitutional argument was "inadequately briefed" when it was supported only by "general statements regarding the Fourth Amendment and Article I, Section 14 of the Utah Constitution" and a "bare analysis of how our state constitution affords, in certain instances, greater protections than the federal constitution," and failed to include any discussion of "how the protections afforded under the Utah Constitution impact" the defendant's specific claims); *State v. Worwood*, 2007 UT 47, ¶¶ 18–19, 164 P.3d 397 (stating that "cursory references to the state constitution within arguments otherwise dedicated to a federal constitutional claim," without "distinct legal argument or analysis" of the state constitution, are "inadequate" to properly brief the state constitutional issues), and we do likewise here.

6. Evans directs our attention to two statutes, both inapplicable here, that specifically authorize officers to act with reasonable force in particular contexts. *See* Utah Code Ann. § 53-10-404(3) (LexisNexis 2015) (authorizing the collection of DNA samples from certain individuals, and specifically stating that "[t]he responsible agency may use reasonable force . . . to collect the DNA sample if the person refuses to cooperate with the

(continued…)

¶18    Finally, Evans's position—which would allow suspects to thwart, or at least delay, execution of a search warrant simply by resisting—has strong policy drawbacks. Many courts have noted that it makes little sense to incentivize noncompliance with (or active resistance to) the execution of search warrants. *See, e.g.*, *United States v. Bullock*, 71 F.3d 171, 176 & n.4 (5th Cir. 1995) (stating that the suspect "had no right to resist execution of a search warrant" and that, due to his resistance, "he was the one who decided that physical force would be necessary"); *United States v. Johnson*, 462 F.2d 423, 427 (3d Cir. 1972) (stating that "a person does not have the right to forcibly resist execution of a search warrant"); *United States v. Jensen*, No. CR. 08-50031, 2010 WL 11537913, at *36 (D.S.D. Feb. 12, 2010) (stating that a defendant "cannot resist a lawfully-executed search warrant and then be rewarded for his conduct with the exclusion of potentially-incriminating evidence"); *Clary*, 2 P.3d at 1261 (stating that the "defendant had no right to resist service of a court order authorizing extraction of his blood," and that "[w]hen he refused to [voluntarily submit], he left the officers no alternative but to overcome his resistance with reasonable force"); *Carr v. State*, 728 N.E.2d 125, 129 (Ind. 2000) (stating that the law should not "create an incentive to refuse to comply with

_____

(…continued)

collection"); *id.* § 77-23-210(4) (Supp. 2018) (stating that officers executing warrants for the search of physical structures (e.g., buildings) "may use only that force which is reasonable and necessary to execute the warrant"). The State does not argue that either of these statutes applies here, and Evans correctly notes that, because these statutes are inapplicable, they do not provide independent authorization for the officers' use of force in collecting the DNA sample from Evans. But winning this point does not help Evans in the long run, because it does not follow from the officers' lack of *statutory* authority to use reasonable force that their actions were *constitutionally* impermissible. *See Dalia v. United States*, 441 U.S. 238, 257 & n.19 (1979).

valid search warrants"). Institution of a legal rule under which officers would be compelled, upon encountering resistance to the execution of a warrant, to return to the magistrate to obtain a specific authorization for the use of reasonable force would create just such a perverse incentive.

¶19　For these reasons, we conclude that a validly issued search warrant carries with it an implicit authorization for the use of reasonable force, when necessary, in its execution. Even though the warrant in question here did not contain an express statement authorizing the use of reasonable force, such an authorization was implied in the issuance of the warrant, and officers did not need to return to the magistrate to obtain a second warrant containing specific instructions as to how it should be executed.

B

¶20　But an authorization to use "reasonable force" in the execution of a search warrant does not function as permission for officers to act however they please when executing such warrants. *See Hummel-Jones v. Strope*, 25 F.3d 647, 650 (8th Cir. 1994) (stating that "possession of a search warrant does not give the executing officers a license to proceed in whatever manner suits their fancy"). The force used in executing warrants must, of course, be reasonable; indeed, "[e]ven when armed with a valid search warrant, law enforcement may violate a defendant's Fourth Amendment rights if the manner in which the warrant is executed is unreasonable or unnecessarily harmful." *See United States v. Jensen*, No. CR. 08-50031, 2010 WL 11537913, at *32 (D.S.D. Feb. 12, 2010); *see also Dalia v. United States*, 441 U.S. 238, 258 (1979) (stating that "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness").

¶21　Evans asserts that the force the detectives applied to him in this case was unreasonable and excessive. He points out that he was placed in handcuffs, leg irons, and a belly chain, and that

four or five "pretty large" detectives held him down, applied a "control hold," and forcibly accessed his mouth to perform the swab. He asserts, no doubt accurately, that these actions caused him pain, and claims that the force used was unreasonable.

¶22 In assessing the reasonableness of force used in the execution of a valid search warrant, we apply the balancing test articulated by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). In that case, the Court declared that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395. Assessing the reasonableness of the force used in a particular situation "requires a careful balancing" of (a) "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against (b) "the countervailing governmental interests at stake." *Id.* at 396 (quotation simplified). While *Graham* involved an arrest warrant, courts assessing the reasonableness of force used in executing an otherwise-valid search warrant have applied the two-prong balancing test articulated in *Graham*, *see, e.g.*, *Jensen*, 2010 WL 11537913, at *32–33; *State v. Clary*, 2 P.3d 1255, 1261 (Ariz. Ct. App. 2000), and we do likewise here.[7]

---

7. Instead of the two-prong *Graham* test, both sides ask us to apply a slightly different three-part balancing test articulated by the United States Supreme Court in *Winston v. Lee*, 470 U.S. 753 (1985). Pursuant to that test, courts are to weigh (a) "the extent to which the procedure may threaten the safety or health of the individual"; (b) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity"; and (c) "the community's interest in fairly and accurately determining guilt or innocence." *Id.* at 761–62. In our view, that test is more properly used to assess the reasonableness of a

(continued…)

¶23 Under the *Graham* test, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (articulating a standard of "reasonableness at the moment"). Indeed, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (quotation simplified). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Moreover, "the reasonableness inquiry in an excessive force case

---

(…continued)

search procedure that is either proposed to be used pursuant to a requested warrant or that has been used already, without judicial pre-approval, in an exigent situation. *See id.* (applying the three-part test to the question of whether a court should issue an order allowing surgical invasion of a suspect's body to retrieve a bullet); *State v. Hodson*, 907 P.2d 1155, 1157 (Utah 1995) (applying the three-part test to the question of the reasonableness of officers' actions in conducting a warrantless search of a suspect's mouth based upon probable cause in an exigent situation). When a warrant has already been properly obtained, and the propriety of the search procedure (e.g., a buccal swab) authorized by that warrant is uncontested, and the only question is whether the force used in executing the warrant is reasonable, the better test is the *Graham* test; indeed, the first factor in the *Winston* test—analyzing the procedure to be used—may not be directly applicable to a situation like ours where no party contests the propriety of the search procedure. We therefore apply the two-factor *Graham* test to this situation, but note that—due to the similarity between the two *Graham* factors and the latter two *Winston* factors—the outcome of this case would be the same under either analysis.

is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (quotation simplified). This test is fact-specific and "not capable of precise definition or mechanical application," and "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting" the officers' efforts. *Id.* at 396 (quotation simplified).

¶24    The first general factor to consider is "the nature and quality of the intrusion on the individual's Fourth Amendment interests." *Id.* (quotation simplified). In this situation, Evans was already in custody at the time the search was performed, and officers had already obtained a valid warrant to search his person for DNA by means of a buccal swab. Evans does not contest the propriety of either his arrest or the search warrant. Moreover, as already noted, the procedure officers planned to use to execute the warrant (a buccal swab) is relatively non-invasive, quick, and painless, and had already been specifically authorized by a magistrate. Had the officers been able to execute the warrant without encountering resistance, not even Evans (given his acknowledgment that the warrant was valid) would contend that any Fourth Amendment violation occurred. And this is not a situation in which the officers wanted to apply force, or in which they applied force before giving Evans a chance to voluntarily comply. *See Jensen*, 2010 WL 11537913, at *34 (stating that "[t]his is not a case where law enforcement initiated the hostility"). Here, officers asked Evans to voluntarily open his mouth, and even showed him a copy of the search warrant they had obtained that authorized the buccal swab. It was only upon Evans's resistance that officers began to apply force.

¶25    And in this case, Evans's resistance was substantial. According to the officers, he was thrashing and kicking his arms and legs in an effort to resist the swab, a circumstance that could

have resulted in injury to the officers. According to the record, Evans was held down and placed in handcuffs, leg irons, and a belly chain only *after* he began thrashing and kicking, and we discern nothing inappropriate or excessive about using such restraints in the face of such active resistance.

¶26 The record submitted to us is somewhat vague about exactly how officers gained access to Evans's mouth. Evans maintains that the "control hold" used on his wrist was painful, a contention we have no reason to disbelieve. But the record does not tell us what a "control hold" is, nor does it contain much specific information about the mechanism by which officers eventually succeeded in swabbing Evans's cheek. The most fulsome description of that process that we have been able to find is the technician's testimony that officers "h[e]ld [Evans's] mouth" while he "managed to get into [Evans's] cheek and do the swab" "through clenched teeth." Certainly, officers may not employ excessive force to compel an individual to open his mouth. We know from previous Utah case law, as well as common sense, that placing a gun to a suspect's head or choking a suspect's airway in an effort to compel him to open his mouth would constitute excessive force. *See State v. Hodson*, 907 P.2d 1155, 1157–58 (Utah 1995) (determining that excessive force was used when officers held a gun to a suspect's head, and put an arm around the suspect's neck and throat, in an effort to compel the suspect to disgorge the contents of his mouth). But in the absence of more detailed information about a "control hold" or about the precise mechanism used to gain access to Evans's mouth, we cannot conclude that Evans has carried his burden of persuading us that the force used was excessive. *See State v. Alverez*, 2006 UT 61, ¶ 32, 147 P.3d 425 (determining that officers did not use excessive force when they grabbed the suspect's arms and wrists and "twisted them," which "forced him to bend forward" thus "making it more difficult for him to swallow" the contents of his mouth).

¶27 In the end, the Fourth Amendment intrusion Evans complains of resulted from his own resistance to a benign

procedure executed under a lawful warrant.[8] *See Graham*, 490 U.S. at 396 (stating that, among other things, courts should consider whether the suspect "is actively resisting" officers' efforts); *Hodson*, 907 P.2d at 1157 (stating that, "in the absence of any resistance, violence, or opposition to them, police officers cannot reasonably threaten to hurt people they are searching"). Evans's assertion that he "was physically assaulted by police in order to allow the detectives to forcibly obtain the evidence they sought" does not account for Evans's significant role in complicating what would otherwise have been a brief, straightforward, and minimally invasive encounter. S*ee United States v. Bullock*, 71 F.3d 171, 176 & n.4 (5th Cir. 1995) (stating that

---

8. The State appropriately acknowledges the strength of Evans's argument that his DNA "could have been obtained another day," and that it "was not going anywhere." If Evans's resistance had been related to, say, some sort of temporary medical condition, the State should of course have waited for a more appropriate moment to collect the DNA sample. But on this record, there is no indication that Evans's resistance was related to any momentary condition, or that he would have been more cooperative on a later occasion. Any suggestion to the contrary is pure speculation. *See United States v. Jensen*, No. CR. 08-50031, 2010 WL 11537913, at *37 (D.S.D. Feb. 12, 2010) (stating that "the court cannot speculate as to whether [the suspect] would have been more cooperative at some later date"). And as a general matter, officers are not required to wait until a time convenient for the suspect to execute the search warrant, as long as officers do not act unreasonably. *See State v. Alverez*, 2006 UT 61, ¶ 36, 147 P.3d 425 (stating that "[t]he administration of justice and crime prevention require convenient access to evidence where this access can be provided in a reasonable fashion," and concluding that officers were not required to wait for drugs concealed in the suspect's mouth to "reappear[] in some form in the future" so long as "the method of preventing the [suspect's] concealment was a reasonable one").

the suspect "had no right to resist execution of a search warrant" and that, due to his resistance, "he was the one who decided that physical force would be necessary"); *State v. Clary*, 2 P.3d 1255, 1261 (Ariz. Ct. App. 2000) (stating that "defendant had no right to resist service of a court order authorizing extraction of his blood," and that "[w]hen he refused to [voluntarily submit], he left the officers no alternative but to overcome his resistance with reasonable force").

¶28 The other factor to consider under *Graham* is the government's countervailing interest in obtaining the evidence in question. Here, the State has a compelling interest in preserving the safety of the community by accurately identifying perpetrators of serious crimes. *See Alverez*, 2006 UT 61, ¶ 36 (stating that "[t]he administration of justice and crime prevention require convenient access to evidence where this access can be provided in a reasonable fashion"). And the crime Evans was suspected of committing was a very serious one: murder. *See Graham*, 490 U.S. at 396 (stating that, among other things, courts should consider "the severity of the crime at issue"). In addition, the evidence sought here consisted of DNA, a type of evidence that provides "unparalleled accuracy" in identifying criminals.[9] *See Maryland v. King*, 569 U.S. 435, 451

---

9. In his reply brief, Evans asserts that, because he had been convicted of a felony in 2005, his DNA should already have been "on file with the Bureau of Forensics," and therefore the State had no pressing need to again obtain his DNA in 2014 by means of a cheek swab. *See* Utah Code Ann. §§ 53-10-403, -404(2)(a) (LexisNexis 2015) (authorizing the collection of DNA samples from certain individuals, including anyone convicted of "any felony"). While this argument certainly contains potential force, it fails in this case for two reasons. First, Evans raised the argument for the first time in his reply brief, and therefore the State has not had a chance to respond to it. For this reason, we do not permit appellants to raise issues for the first time in their

(continued…)

(2013). In this instance, proving that the red L.A. Angels baseball cap belonged to Evans was an important part of the State's case.

¶29   On balance, we conclude that the State's interest in obtaining probative evidence far outweighs the intrusion on Evans's Fourth Amendment rights, especially where that intrusion was necessitated by Evans's active and physical resistance to the search warrant, and where (at least on this record) the actions taken by the officers constituted a measured and proportionate response to the level of Evans's resistance. "Viewed from the objective perspective of a reasonable officer at the scene, the use of force in this case was reasonable." *See Jensen*, 2010 WL 11537913, at *37. We therefore affirm the trial court's decision to deny Evans's motion to suppress.[10]

---

(…continued)
reply brief. *See Brown v. Glover*, 2000 UT 89, ¶ 23, 16 P.3d 540 (stating that "issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court" in order "to prevent the resulting unfairness to the respondent if an argument or issue was first raised in the reply brief and the respondent had no opportunity to respond"). Second, while the State apparently had the right to take a sample of Evans's DNA in 2005 when he was previously convicted, there is no evidence in this record that it ever did so, or that it remains on file and readily available today; all we have in this record is Evans's speculative assertion that his DNA might have been on file with the State. This is insufficient to satisfy Evans's burden on appeal.

10. Because we conclude that no constitutional violation occurred here, we do not reach the question of whether, on the facts of this case, suppression would have been the proper remedy for any such violation. *See Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006) ("Whether the exclusionary sanction is

(continued…)

II

¶30    Evans also argues that his trial attorney provided constitutionally ineffective assistance by failing to object to two different categories of evidence introduced by the State: (a) three photographs of Evans, standing in front of his vehicles, in which he was making a distinctive hand gesture; and (b) the letter Evans wrote (but did not send) to Fiancée.

¶31    "The Sixth Amendment to the United States Constitution guarantees all defendants the right to effective assistance of counsel." *State v. J.A.L.*, 2011 UT 27, ¶ 25, 262 P.3d 1. "To succeed on a claim of ineffective assistance of counsel, a defendant must show both 'that counsel's performance was deficient' and 'that the deficient performance prejudiced the defense.'" *State v. Galindo*, 2017 UT App 117, ¶ 7, 402 P.3d 8 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (quotation simplified). "Because both deficient performance and resulting prejudice are requisite elements of an ineffective assistance of counsel claim, a failure to prove either element defeats the claim," *State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769, and therefore "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," *Strickland*, 466 U.S. at 697.

¶32    To show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

---

(…continued)
appropriately imposed in a particular case is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." (quotation simplified)).

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "*Strickland*'s prejudice prong requires a court to 'consider the totality of the evidence before the judge or jury' and then 'ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quoting *Strickland*, 466 U.S. at 695–96).

A

¶33 Evans first argues that his attorney was ineffective for failing to object to three photographs admitted into evidence which showed Evans making a peculiar hand gesture—one that Evans now asserts could only be understood as a gang sign. We reject Evans's argument, because Evans has not shown that the admission of the three photographs prejudiced him.

¶34 The three photographs to which Evans now objects were admitted during a five-day trial that featured more than a hundred exhibits and more than twenty witnesses. Two of the photographs show Evans standing in front of the silver Infiniti sedan, wearing a red L.A. Angels baseball cap, red sneakers, and red shorts. The third shows Evans, wearing different clothing, standing in front of the Escalade identified by Fiancée as the vehicle that Evans had given her as a Mother's Day present. In all three of these photos, Evans can be seen making a distinctive hand gesture.

¶35 Evans has not persuaded us that there exists a reasonable probability that, but for the admission of these three photographs, the outcome of the trial would have been different. While the sedan, the Escalade, and Evans's clothing were all relevant to the issues discussed at trial, at no time did any lawyer or witness mention the hand gesture depicted in the photographs, or make any statements tying Evans to gang activities. And the motive for the murder proffered by

the State—romantic jealousy—was purely personal, unconnected to any type of gang involvement. Evans speculates both that the hand gesture is indeed a gang sign (given that no one mentioned the hand gesture at trial, there is no actual evidence to support that assertion) and that some of the jurors might have inferred from the photographs that Evans was a member of a gang. We find these inferences speculative, but conclude that, even if some or all of the jurors had drawn the conclusion that Evans was a gang member, there is no reasonable probability that the outcome of the trial would have been any different.

¶36   In this case, the overall evidence of Evans's guilt was overwhelming enough to make it extremely unlikely that any gang inferences the jury might have silently and improperly drawn (without any help from any of the attorneys) would have made a material difference to the outcome. The CSLI and surveillance camera footage constituted compelling evidence of Evans's whereabouts, effectively debunking Evans's initial claim that he was in Wendover at the time of the shooting. The DNA evidence constituted additional compelling evidence that Evans had been present at the scene of the shooting where his cap was left behind. And the testimony from the various witnesses (i.e., Neighbor, Friend, Fiancée, Guest, and the two jailhouse informants), as well as the documentary evidence (i.e., text messages), all strongly supported the State's theory of the case.

¶37   Taken together, this evidence pointed overwhelmingly toward Evans's guilt, and none of it relied on showing that Evans was affiliated with a gang or gang activity. Under these circumstances, Evans has not shown that, had his attorney succeeded in excluding these three photographs, there was "a reasonable probability that . . . the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. We accordingly conclude that Evans's counsel was not ineffective for failing to object to the three photographs.

B

¶38   Next, Evans argues that his attorney was ineffective for failing to object to the admission of the unsent letter that he composed for Fiancée some ten days before the shooting. In addition to discussing his concerns about Fiancée's alleged infidelity, Evans also described himself, in the letter, as "moody" and an "asshole." While this evidence was certainly no help to Evans, we are unpersuaded that there exists any reasonable probability that the outcome of the trial would have been different had this letter been excluded. The State presented it merely as background evidence supporting its theory of the case, and it was hardly a smoking gun, especially considering the much more explicit text messages that came into evidence. And, as noted above, the overall evidence of Evans's guilt was overwhelming. Under these circumstances, Evans has not shown that, had the letter been excluded from evidence, there exists "a reasonable probability that . . . the result of the proceeding would have been different." *See id.* Accordingly, his counsel was not ineffective for failing to object to admission of the letter.

CONCLUSION

¶39   The trial court did not err in denying Evans's motion to suppress the DNA evidence resulting from the forcible cheek swab, because the search warrant came with an authorization to use reasonable force, and the force used in this case was not unreasonable. Moreover, Evans has not persuaded us that his trial attorney provided ineffective assistance.

¶40   Affirmed.

_____