**2021 UT 63**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent*,

*v.*

DOUGLAS DWAYNE EVANS,
*Petitioner*.

No. 20190739
Heard April 21, 2021
Filed November 4, 2021

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Ann Boyden
No. 141906586

Attorneys:

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Solic. Gen.,
Salt Lake City, for respondent

Herschel Bullen, Salt Lake City, for petitioner

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUDGE DIREDA joined.

Having recused himself, JUSTICE HIMONAS does not participate
herein; JUDGE MICHAEL D. DIREDA sat.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1 Two days after Ted Kelbach was shot in his home by an intruder, police arrested Douglas Evans for the murder. They got a search warrant to obtain a sample of Evans's DNA through a

"buccal swab" of his cheek.[1] But when a lab technician attempted to take the swab, Evans physically resisted. Officers had to restrain his limbs and force open his mouth so the technician could safely obtain the DNA sample. Testing showed that Evans was a genetic match for DNA found on a baseball cap left at the crime scene. And Evans was a possible contributor to DNA found on a broken piece of fence leading to Kelbach's back door, where Kelbach had been shot.

¶2 Prior to trial, Evans moved to suppress the DNA evidence on the grounds that the forcible collection of the sample had violated his Fourth Amendment rights. The district court denied the motion, and the evidence was admitted at trial. The jury convicted Evans of murder, aggravated burglary, and possession of a weapon by a restricted person.

¶3 Evans appealed. Relevant here, he asserted that the force used by officers was excessive and therefore unconstitutional, and that even if the force was reasonable, the officers were not statutorily authorized to use any force whatsoever in executing the warrant. The court of appeals rejected these and Evans's other claims and affirmed.

¶4 On certiorari, Evans argues that the court of appeals wrongly affirmed the district court's dismissal of his motion to suppress. We affirm.

---

[1] A buccal swab is a routine method for obtaining a DNA sample that "involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells." *Maryland v. King*, 569 U.S. 435, 444 (2013) (citation omitted). "The procedure is quick and painless." *Id.*

## BACKGROUND[2]

¶5   A few days prior to Kelbach's murder, Evans accused his fiancée of cheating on him with Kelbach and sent her a series of explicit text messages. In them, Evans wrote that he knew it was Kelbach's "old ass u been going to see sneaky" and that he was "going on ah ram page I know where dat old fuck live." Evans also warned his fiancée, "I told u u cheat u die it was ur choice u chose." His fiancée did not respond.

¶6   On the day of Kelbach's murder, Evans returned to Salt Lake City from an overnight trip to Wendover, Nevada with a female friend. Evans and the friend traveled to and from Wendover in Evans's silver Infiniti sedan, notable for its oversized rims. During the trip, Evans wore a red, "59FIFTY,"[3] flat-brimmed L.A. Angels baseball cap.

¶7   Upon returning from Wendover, Evans dropped off his friend at another friend's house. He then texted his fiancée a picture of a black handgun and a message asking her to "just please be honest wit me for once, please."

¶8   Later that day, one of Kelbach's neighbors noticed a silver sedan with "really large" rims parked in front of Kelbach's house. The neighbor observed a man matching Evans's description and wearing jeans and a red t-shirt emerge from the vehicle and start walking toward Kelbach's house.

---

[2] Because "[t]he legal analysis of search and seizure cases is highly fact dependent," *State v. Brake*, 2004 UT 95, ¶ 2, 103 P.3d 699, we begin with a detailed recitation of the facts. In doing so, "we construe the record facts in a light most favorable to the jury's verdict," *State v. Maestas*, 2012 UT 46, ¶ 3, 299 P.3d 892 (citation omitted) (internal quotation marks omitted), and present conflicting evidence "only as necessary to understand issues raised on appeal." *State v. Jeffs*, 2010 UT 49, ¶ 3, 243 P.3d 1250 (citation omitted).

[3] "59FIFTY" is the "flagship style" of the New Era cap company and is advertised as "an icon in sport and street culture." *59FIFTY Fitted Hats & Caps*, NEW ERA CAP, https://www.neweracap.com/All-Headwear/59FIFTY/c/AHE59F (last visited Aug. 27, 2021). The style is distinctive for its fitted cap, flat brim, and gold-sizing sticker. *See id.*

¶9    At the time, Kelbach was in his bedroom with a female guest. The guest and Kelbach heard several loud knocks at Kelbach's back door. Kelbach left the bedroom to answer the door and after a couple of minutes, the guest heard Kelbach say, "I haven't seen her, I swear." Immediately thereafter, the guest heard a "loud crack," followed by silence. She went to investigate and saw the backside of "a darker man with longer hair" wearing "jeans and a red tank top" walk down the driveway and get in a silver sedan and drive off. The guest found Kelbach lying face down next to the door with "blood everywhere." Kelbach's face was swollen, and he did not appear to be breathing. The guest could smell gunpowder.

¶10 When detectives arrived at the crime scene, they discovered a red, "59FIFTY," flat-brimmed L.A. Angels baseball cap on the ground next to Kelbach. Later that day, Evans picked up his friend in a Cadillac Escalade, and they drove back to Wendover. When Evans picked up his friend, he was no longer wearing his red L.A. Angels hat.

¶11 Two days later, police arrested Evans. Evans denied any involvement in the shooting and claimed to have been in Wendover at the time. In a subsequent police interview, Evans told several lies, including denying having access to his Infiniti on the day of the murder and denying owning a red L.A. Angels hat. Police eventually recovered the Infiniti, finding a cell phone inside and blood on the driver's side door. Police also recovered four more cell phones from Evans's Escalade. They later obtained cell-site location information for all five phones, which placed Evans within 200 meters of Kelbach's home at the time of the shooting.

*The Buccal Swab*

¶12 The day after Evans's arrest, a judge signed a search warrant authorizing investigating officers to take a sample of Evans's DNA using a buccal swab. Officers first asked Evans if he would submit voluntarily to the swab. Evans refused, stating he wanted his attorney present before giving a DNA sample. Officers then advised Evans that they had a warrant and "it was up to [Evans] on how that process went," but they "preferred it went voluntar[il]y." Evans again refused to comply and asked for his attorney, so officers showed Evans the warrant, read it to him, and let him look at it.

¶13 Despite being presented with the warrant, Evans forcibly resisted having his cheek swabbed. He refused to open his mouth and thrashed and kicked at the officers. In response, officers called

4

in additional law enforcement to help. They handcuffed Evans and placed him in leg irons and a belly chain. The officers applied "control holds"[4] to control Evans's thrashing. One officer placed his foot over Evans's foot to prevent Evans from kicking the technician who was attempting to administer the swab. Another officer pried open Evans's mouth. It ultimately took "four or five pretty large detectives"[5] to hold Evans still so that the technician could reach into his mouth to perform the swab.

¶14 The results of the DNA test showed that the odds of the recovered baseball cap having been worn by someone other than Evans were 1 in 227,000. The results also showed that Evans was a possible contributor to DNA found on a broken piece of fence leading to Kelbach's back door.

*The Trial*

¶15 The State charged Evans with murder, aggravated burglary, and possession of a weapon by a restricted person. Prior to trial, Evans moved to suppress the DNA evidence obtained from the buccal swab on the grounds that the officers had used unreasonable force in obtaining it. He did not contest the validity of the search warrant itself. The district court denied Evans's motion, concluding that the force used by the officers "was reasonable because it was no more than was necessary" to counter Evans's resistance.

¶16 The case proceeded to trial. In addition to the DNA evidence, the State's evidence included, among other things, surveillance videos and cell-site location information confirming Evans had driven from Wendover to Salt Lake City on the day of the murder; testimony from two witnesses placing a man matching Evans's description at Kelbach's home around the time of the murder; testimony from two of Evans's cellmates that Evans had confessed to the murder; the presence of the red baseball cap—in Evans's size and matching one he wore in a

---

[4] The record contains no information describing the control holds, other than the district court's finding that they were "used to control the thrashing of [Evans] as he resisted the buccal swab."

[5] Witness testimony alternatively described the number of officers required to hold Evans down as "four or five" and "five or six."

photograph—at the crime scene; and the text messages and other communications about Kelbach that Evans sent to his fiancée. After a five-day trial, a jury found Evans guilty on all charges.

*The Appeal*

¶17 Evans appealed. Alongside multiple other claims, Evans argued that the district court erred in denying his motion to suppress the DNA evidence. Specifically, Evans contended that the search warrant did not—either expressly or implicitly—give police officers the authority to obtain his DNA by means of force, and that even if it did, the force that police officers used to collect the sample was excessive and in violation of his rights under the Fourth Amendment of the United States Constitution and Article I, section 14 of the Utah Constitution. Evans also made a statutory claim, arguing that the Utah Legislature did not intend for any force to be used to obtain a DNA sample under these circumstances because no applicable rule or statute explicitly authorized its use.

¶18 The court of appeals found Evans's arguments unpersuasive and affirmed. *State v. Evans*, 2019 UT App 145, ¶¶ 39–40, 449 P.3d 958. It held that the district court had not erred in denying Evans's motion to suppress the DNA evidence because a search warrant implicitly authorizes executing officers to use reasonable force if necessary, and the force used here was reasonable. *Id.* ¶¶ 13–29. The court of appeals also rejected Evans's contention that the officers' use of force was unlawful because it was not expressly authorized by statute, noting that any alleged lack of statutory authority had no bearing on whether the officers' actions were constitutionally permissible. *Id.* ¶ 17 n.6.

¶19 Evans petitioned for certiorari, which we granted. We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

**STANDARDS OF REVIEW**

¶20 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Marquina*, 2020 UT 66, ¶ 24, 478 P.3d 37 (citation omitted). "The correctness of the court of appeals' decision turns, in part, on whether it accurately reviewed the trial court's decision under the appropriate standard of review." *State v. Levin*, 2006 UT 50, ¶ 15, 144 P.3d 1096. "[A] trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation [is] a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. Factual findings are reviewed for

clear error, but legal conclusions are reviewed for correctness. *Id.* And "[i]n search and seizure cases, no deference is granted to either the court of appeals or the district court regarding the application of law to underlying factual findings." *State v. Alverez*, 2006 UT 61, ¶ 8, 147 P.3d 425. Finally, the interpretation of a statute presents a question of law that we review for correctness. *Castro v. Lemus*, 2019 UT 71, ¶ 11, 456 P.3d 750.

## ANALYSIS

¶21 We granted certiorari to consider the following issues: (1) whether the court of appeals erred in affirming the district court's denial of Evans's motion to suppress evidence based on his Fourth Amendment argument that the police officers lacked authority to use force,[6] and used unreasonable force, in obtaining a DNA sample pursuant to a warrant; and (2) whether the court of appeals erred in rejecting Evans's argument that police officers must have statutory authorization to use force to obtain a DNA sample pursuant to a warrant.

¶22 We address Evans's constitutional argument first.

## I. FOURTH AMENDMENT

¶23 Because Evans no longer challenges the court of appeals' holding that a validly issued search warrant implicitly authorizes officers to use reasonable force when necessary to execute it, *see supra* ¶ 21 n.6, the sole constitutional question before us is whether the use of force here was reasonable. We conclude that Evans has not met his burden of showing the force used here was unreasonable and affirm the court of appeals.

¶24 Evans argues that the detectives employed "excessive and unreasonable" force to obtain his DNA in contravention of his rights under the Fourth Amendment of the United States Constitution and Article I, section 14 of the Utah Constitution. The Fourth Amendment guarantees the "right of the people to be

---

[6] On appeal, Evans appeared to contest whether a search warrant that is silent as to the method of its execution includes implicit authorization to employ reasonable force when necessary. The court of appeals held that it does, *State v. Evans*, 2019 UT App 145, ¶ 19, 449 P.3d 958, and Evans has abandoned this argument on certiorari. So that part of the court of appeals' opinion is not before us.

secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. Our state constitution is phrased in terms that mirror the text of the Fourth Amendment. *See* UTAH CONST. art. I, § 14 ("The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated . . . ."). Neither party, however, has argued for a separate analysis under the Utah Constitution, and we therefore address the issue solely under the Fourth Amendment.[7]

¶25 It is axiomatic that "the 'touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances," *id.*, and depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers," *State v. Warren*, 2003 UT 36, ¶ 31, 78 P.3d 590 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

¶26 To be reasonable, a search must be (1) "lawful at its inception," and (2) "executed in a reasonable manner." *Illinois v. Caballes*, 543 U.S. 405, 407–08 (2005). When challenged, the government "bears the burden of proving that its warrantless actions were justified." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994). But a "search pursuant to a warrant . . . is presumed reasonable because such warrants may issue only upon a showing of probable cause." *Walczyk v. Rio*, 496 F.3d 139, 155–56 (2d Cir. 2007) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *see also United States v. Leon*, 468 U.S. 897, 913–14 (1984) (noting that a warrant issued by an impartial magistrate provides a "reliable safeguard against improper searches").

¶27 Accordingly, in instances like the one here, where the challenged search was lawful at its inception, the burden of proof shifts to the defendant to show its execution was unreasonable. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *Carhee*, 27 F.3d at 1496 ("[I]f the search or seizure

---

[7] The court of appeals likewise rejected Evans's state constitutional claims as inadequately briefed. *Id.* ¶ 17 n.5.

was pursuant to a warrant, the defendant has the burden of proof." (citation omitted)).

¶28 While "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant," *Dalia v. United States*, 441 U.S. 238, 257 (1979), a lawful search may become unreasonable if the force used to conduct it is excessive, *see Caballes*, 543 U.S. at 407 ("[A search] lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."); *Dalia*, 441 U.S. at 258 ("[T]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness."). And although "officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search" when executing a warrant, "the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time" are unreasonable. *Los Angeles Cnty., California v. Rettele*, 550 U.S. 609, 614 (2007).

¶29 In their briefing to the court of appeals, both parties applied factors articulated by the United States Supreme Court in *Winston v. Lee*, 470 U.S. 753 (1985), to assess whether the search here was executed reasonably. In *Winston*, the Supreme Court evaluated the reasonableness of a search warrant application seeking to surgically remove a bullet from a suspect's body. *Id.* at 755–58. But the court of appeals held that the *Winston* "test," which focuses primarily on the search procedure itself, "is more properly used to assess the reasonableness of a search procedure that is either proposed to be used pursuant to a requested warrant or that has been used already, without judicial pre-approval, in an exigent situation." *State v. Evans*, 2019 UT App 145, ¶ 22 n.7, 449 P.3d 958.

¶30 The court of appeals then relied on factors articulated in *Graham v. Connor*, 490 U.S. 386 (1989), in which the Supreme Court evaluated a claim that officers had used excessive force during an investigatory stop, to assess the reasonableness of the force used here. *See Evans*, 2019 UT App 145, ¶¶ 22–29. In doing so, the court of appeals concluded that *Graham* is "the better test" with which to evaluate circumstances where "a warrant has already been properly obtained, and the propriety of the search procedure (e.g., a buccal swab) authorized by that warrant is uncontested." *Id.* ¶ 22 n.7.

¶31 On certiorari, Evans argues that the court of appeals applied the wrong standard. He urges us to employ instead the factors enumerated in *Winston* and find the force used to obtain his DNA unreasonable. We therefore begin by analyzing which standard should be applied to the use of force in this case, before turning to whether such force violated Evans's Fourth Amendment rights.

*A. Reasonableness Standard*

¶32 Evans argues that the court of appeals' reliance on *Graham* was improper because that case involved the use of force during an investigative stop (a seizure) without an arrest warrant, and the force at issue in this case was used to obtain DNA (a search) pursuant to a warrant. The circumstances here, Evans reasons, are better analyzed under the *Winston* factors.

¶33 In *Winston*, the Supreme Court evaluated the reasonableness of a proposed surgical intrusion into a suspect's body to recover likely evidence of a crime. 470 U.S. at 755–58; *see supra* ¶ 29. In doing so, the Court emphasized that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Winston*, 470 U.S. at 760 (alteration in original) (quoting *Schmerber v. California*, 384 U.S. 757, 767 (1966)). And it stated that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." *Id.* The *Winston* Court then identified as relevant to "analyzing the magnitude of the intrusion": (1) "the extent to which the procedure may threaten the safety or health of the individual" and (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," to be weighed against (3) "the community's interest in fairly and accurately determining guilt or innocence." *Id.* at 761–62.[8]

---

[8] The Supreme Court ultimately held that the surgery proposed in *Winston* was unreasonable under the Fourth Amendment, noting that it required the suspect to be put under general anesthesia, entailed medical risks subject to considerable dispute, and was sought despite the existence of other evidence. *Winston v. Lee*, 470 U.S. 753, 763–66 (1985).

¶34 Because *Winston* involved a novel kind of search, the Supreme Court's focus in that case was the reasonableness of the search procedure itself. And in this regard, we agree with our court of appeals that some of the factors highlighted by the *Winston* Court make more sense when determining whether a proposed search procedure is reasonable, and do not precisely fit the circumstances here, where we are asked to evaluate only the reasonableness of the force used in executing the search.

¶35 In *Graham*, on the other hand, the Supreme Court assessed whether law enforcement officers had used excessive force during an investigative stop. 490 U.S. at 388–89; *see supra* ¶ 30. The Court held that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395. The Court then stated that an assessment of reasonableness requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citation omitted) (internal quotation marks omitted). And it went on to explain that because Fourth Amendment reasonableness "is not capable of precise definition or mechanical application," a proper reasonableness determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).

¶36 The court of appeals found the factors identified in *Graham* to be more relevant to the facts here.[9] *Evans*, 2019 UT App 145, ¶¶ 22–29. And its reliance on *Graham* was not erroneous. *Graham* provides helpful guidance on how to assess claims of excessive force under the Fourth Amendment. Indeed, the Supreme Court has looked to *Graham* when evaluating whether

_____

[9] In making this determination, however, the court of appeals noted that because of "the similarity between the two *Graham* factors and the latter two *Winston* factors," the outcome here would remain "the same under either analysis." *Evans*, 2019 UT App 145, ¶ 22 n.7.

law enforcement officers executed a search warrant in an unreasonable manner. *See, e.g.*, *Rettele*, 550 U.S. at 614.

¶37 We conclude that both *Winston* and *Graham* provide insight to the extent that they shed light on the general Fourth Amendment reasonableness standard. But every specific factor weighed in those cases is not necessarily relevant here, because the circumstances in this case differ and because Fourth Amendment reasonableness is fact-specific.

¶38 The Supreme Court has "consistently eschewed bright-line rules" when assessing the reasonableness of official conduct under the Fourth Amendment, "instead emphasizing the fact-specific nature of the reasonableness inquiry." *Robinette*, 519 U.S. at 39. And we have likewise emphasized that "[i]n defining the scope of Fourth Amendment rights, there is no ready test for determining reasonableness other than by balancing the need to search . . . against the invasion which the search . . . entails." *State v. Harmon*, 910 P.2d 1196, 1202 (1995) (citations omitted) (internal quotation marks omitted).

¶39 Fundamentally, any determination of reasonableness hinges on a balancing of the public interest on one hand and personal liberty on the other. This balance necessarily depends on context. *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985). And a variety of factors—including at times those articulated in *Graham* and *Winston*—may be relevant to a reasonableness assessment.

¶40 Here, because the propriety of the search procedure itself is not at issue, the only question before us is whether the search was "executed in a reasonable manner." *Caballes*, 543 U.S. at 408. Considerations that are relevant under these circumstances include:

- the nature and extent of the resistance officers faced, *see Graham*, 490 U.S. at 396;

- whether the resistance jeopardized the safety of the officers or others, *see id.*; *Rettele*, 550 U.S. at 614;

- whether the resistance prevented the officers from conducting the search, *see Rettele*, 550 U.S. at 614 (officers may take action necessary to "ensure . . . the efficacy of the search");

- whether the force used endangered the suspect's health or safety or physically injured him or her, *see*

*Winston*, 470 U.S. at 761; *State v. Alverez*, 2006 UT 61, ¶ 31, 147 P.3d 425; and

- whether the force used inflicted unnecessary pain, was unnecessarily prolonged, or was otherwise out of proportion to the resistance the officers faced, *see Rettele*, 550 U.S. at 614.

¶41 But we emphasize that these considerations constitute neither an exhaustive list nor a multi-pronged test. We simply find them to be relevant to determining whether the officers used reasonable force under these specific circumstances. The ultimate barometer of Fourth Amendment reasonableness remains a careful and objective weighing of the public interest on one hand and the individual's Fourth Amendment rights on the other, in light of the totality of the circumstances. *Warren*, 2003 UT 36, ¶ 31.

### B. Application

¶42 Because it is undisputed that the search in this case was supported by a valid warrant and thus lawful at its inception, the burden of proof falls on Evans. *See supra* ¶¶ 15, 27. Evans contends that the officers' use of force to obtain his DNA was excessive and therefore unreasonable under the Fourth Amendment. He points out that he was placed in handcuffs, leg irons, and a belly chain; and that five or six "pretty large" detectives held him down, pried his mouth open, and applied a "control hold." As the court of appeals observed, Evans "asserts, no doubt accurately, that these actions caused him pain." *Evans*, 2019 UT App 145, ¶ 21.

¶43 But the record also indicates that Evans's active and physical resistance both preceded and compelled the use of *some* force to obtain his DNA. The record shows that when the officers attempted to execute the warrant, Evans thrashed, kicked, and clenched his mouth shut. And the testimony of one of the officers indicates that Evans's resistance posed a threat to the safety of others in the room—including the officers and the technician attempting to perform the buccal swab—and impeded their ability to execute the warrant:

> **Q:** And you indicated that the physical fight, at least, that he put up was the worst you've ever experienced; is that correct?
>
> **A:** I've never had nobody so uncooperative in the 27 years. There's been some that have said they want an attorney. There's some that have said, you know,

they don't want to cooperate. But to the point of moving out tables and bringing in four or five pretty large detectives to physically hold him down to obtain that, I've never had that in my career before, no.

¶44 Evans does not deny that the force used here was deployed to keep him still in order to protect those around him and permit the technician to perform the swab. Likewise, Evans does not deny that the handcuffs, leg irons, and belly chain placed on him were designed to restrain his limbs and body. And the district court found that "[t]he control hold itself was used to control the thrashing of [Evans] as he resisted the buccal swab. The officer placing his foot on [Evans's] foot did so specifically to prevent [Evans] from kicking the technician who was trying to obtain the swab."

¶45 We also note that the officers gave Evans a chance to voluntarily comply. When he initially refused to do so, the officers showed him the warrant and read it to him. And they did not use force until Evans actively resisted.

¶46 Evans has offered no evidence that the officers' use of force posed any concrete risk to his health or safety. He admits that the control hold "is unfortunately not described [on the record] either in the manner of its use or its effect." And he offers only speculation that the control hold could possibly "injure the person's wrist if it were continued with sufficient force for a sufficient amount of time." *Cf. Winston*, 470 U.S. at 761. But Evans provides no supporting evidence for this statement, nor does he indicate that the officers employed the hold for any longer than necessary—much less for a "sufficient amount of time" or with "sufficient force" to pose a risk of injury. Evans also concedes that the officers did not, in fact, injure him.

¶47 Evans has similarly failed to demonstrate that any pain caused by the officers' efforts to restrain him was more painful or prolonged than necessary to subdue him in order to perform a minimally-intrusive and judicially-sanctioned buccal swab. *Cf. Rettele*, 550 U.S. at 614; *King*, 569 U.S. at 465–66. Evans makes speculative statements about the likely pain inflicted on him by the officers' use of force—the "handcuffs [were] no doubt tight and painful"; "the whole reason for [the control hold] is to inflict extreme pain"; he "could only have been in a state of extreme discomfort" when the control hold was implemented, because he was already handcuffed with his feet restrained and in a belly

chain. But he fails to provide any record evidence supporting these claims. And he has provided no evidence that the officers restrained him for any longer than was necessary to perform the buccal swab.[10]

¶48 Again, the touchstone of the Fourth Amendment is reasonableness. *See Robinette*, 519 U.S. at 39. And Evans—as the proponent of the claim that a Fourth Amendment violation occurred—has failed to provide sufficient information to show that the force used to counter his physical resistance was unreasonable. Accordingly, Evans has not met his burden of demonstrating that the execution of the search in this instance amounted to a constitutional violation.

¶49 But while Evans has failed to meet his burden to prove a constitutional violation occurred here, we emphasize that any allegation of excessive force during the execution of a search warrant must be carefully examined under the Fourth Amendment to ensure that the individual's right to be free from unreasonable force during a search has not been violated.

¶50 Because, on the face of the record before us, we lack the information to find that a constitutional violation occurred in this case, we do not reach the question of whether any error would require reversal.

## II. STATUTORY AUTHORIZATION

¶51 We next turn to Evans's argument that the officers executing the search warrant here required statutory authorization to use any force to obtain a buccal swab, and that

---

[10] Evans does, however, argue that given his repeated requests for the presence of an attorney, allowing him to confer with his lawyer might have diffused the situation without a resort to force. We do not disagree with this contention. But nothing in the Fourth Amendment or our case law requires officers to accede to a defendant where the presence of an attorney is not constitutionally mandated and where a duly executed warrant authorizes officers to act immediately. And while we agree with Evans's assessment that there was no extreme exigency to the circumstances here, neither was there any indication that he would be more compliant at a later date.

the Utah Legislature has chosen to prohibit even reasonable force in this context.

¶52 In the court of appeals, Evans argued that any use of force to obtain the DNA sample in this case "would have to have been authorized by an applicable rule or statute," because "the search warrant itself did not authorize the detectives to use physical force." He then directed that court's attention to rule 40 of our rules of criminal procedure (governing the issuance of search warrants) and two statutory provisions (authorizing reasonable force under certain circumstances) and argued that because "no such rule or statute" explicitly sanctioned the use of force when performing a buccal swab pursuant to a warrant, any force used here was necessarily unlawful.

¶53 The court of appeals rejected this argument, observing that the United States Supreme Court has "made clear that search warrants need not specify the 'precise manner in which they are to be executed'" and has "generally left to the discretion of the executing officers . . . the details of how best to proceed with the performance of a search authorized by warrant." *State v. Evans*, 2019 UT App 145, ¶ 16, 449 P.3d 958 (quoting *Dalia v. United States*, 441 U.S. 238, 257 (1979)). It then concluded that although the statutes cited by Evans "do not provide independent authorization for the officers' use of force in collecting the DNA sample" in this case, "winning this point does not help Evans in the long run, because it does not follow from the officers' lack of *statutory* authority to use reasonable force that their actions were *constitutionally* impermissible." *Id.* ¶ 17 n.6.

¶54 Evans reiterates his statutory arguments here. He references criminal rule 40 and the two statutes providing for the use of reasonable force in specific contexts. And he again asserts that this rule and these statutes do not permit law enforcement officers to use any force when obtaining a buccal swab pursuant to a warrant. He then invokes the *inclusio unius est exclusio alterius*[11] canon of statutory construction to argue that, because the two statutes he references authorize reasonable force in certain contexts, the negative implication holds that these statutes

---

[11] *Inclusio unius est exclusio alterius* (*inclusio unius*) is more commonly cited as *expressio unius est exclusio alterius* (*expressio unius*), and we use the more commonly cited terminology herein.

prohibit any use of force in other, unmentioned contexts — such as the collection of a buccal swab pursuant to a warrant.

¶55 Like the court of appeals, we find Evans's statutory arguments unpersuasive. He gives no legal authority or analysis supporting his premise that statutory authority is required before officers may use reasonable force in executing a search warrant. And the language of the two statutes he identifies does not support a negative inference that they implicitly prohibit the use of reasonable force under the circumstances here.

### A. Explicit Statutory Authority

¶56 We first address Evans's argument that criminal rule 40 and Utah Code sections 53-10-404 and 77-23-210 do not explicitly authorize the use of reasonable or excessive force in the execution of a buccal swab warrant.[12]

¶57 Rule 40 of our rules of criminal procedure governs the issuance of search warrants. UTAH R. CRIM. P. 40. Evans states that this rule "provides no helpful guidance as to the use of force in [the] execution of a search warrant on a person." He is correct, to the extent that the rule simply does not address the matter. Our discussion of the use of force in the execution of searches is generally found in our case law, not in this rule. *See, e.g.*, *State v. Alverez*, 2006 UT 61, ¶ 32, 147 P.3d 425 (analyzing the force used to prevent a suspect from swallowing evidence held in his mouth); *State v. Hodson*, 907 P.2d 1155, 1157–58 (Utah 1995) (analyzing the force used to compel a suspect to spit out the contents of his mouth).

¶58 Evans next references Utah Code section 53-10-404. This statute authorizes the administrative, warrantless collection of DNA samples from individuals booked on or convicted of "any violent felony" as defined by Utah Code section 53-10-403(2)(c)(i)

---

[12] We note that at several points in his brief, Evans refers to instances of "excessive force" that might be countenanced by "express authority" for its use. But "excessive force" by its very terms can never be reasonable and is thus never authorized. *See Force*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "excessive force" as "[u]nreasonable or unnecessary force under the circumstances").

(2014).[13] And it permits "[t]he responsible agency [to] use reasonable force . . . to collect the DNA sample if the person refuses to cooperate with the collection." *Id.* § 53-10-404(3)(c) (2014). It does not, however, speak to the collection of DNA samples pursuant to a warrant. So Evans's assertion that this statute does not authorize reasonable force in the execution of a warrant for a buccal swab is accurate, in that the statute does not address that circumstance.

¶59 Lastly, Evans cites to Utah Code section 77-23-210, which relates to searches of physical structures or other enclosures pursuant to a warrant. During the relevant period, the statute provided that officers could use force "reasonably necessary to enter" a "building, room, conveyance, compartment, or other enclosure" under certain circumstances after the issuance of a search warrant. UTAH CODE § 77-23-210 (2013). Evans observes that these provisions do not authorize the use of force in executing a warrant for a buccal swab. We agree. The statute pertains only to the search of physical structures or other enclosures.

¶60 While we agree with Evans's observation that criminal rule 40 and Utah Code sections 53-10-404 and 77-23-210 do not explicitly authorize the use of reasonable force in the execution of a warrant for a buccal swab, we also agree with the court of appeals that this reasoning does not get Evans where he wants to go. *See Evans*, 2019 UT App 145, ¶ 17 n.6. Evans assumes a necessary premise: that law enforcement officers must have statutory authorization before resorting to reasonable force when executing a warrant. But he has not provided any legal basis or analysis for that proposition. The Supreme Court has explained that "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia*, 441 U.S. at 257. And importantly, Evans has not disputed the court of appeals' holding that "a validly issued search warrant carries with it an implicit authorization for the use of reasonable force, when necessary, in its execution." *Evans*, 2019 UT App 145, ¶ 19. Accordingly, we agree with the court of appeals that this statutory argument "does not help Evans in the long run." *Id.* ¶ 17 n.6.

---

[13] We cite to the version of the Utah Code in effect at the time of the crime.

### B. Negative Implication

¶61    Evans next relies on the *expressio unius* canon of statutory construction to argue that the legislature's explicit authorization of reasonable force in the two specific contexts laid out in sections 53-10-404 and 77-23-210 should be read to prohibit the use of reasonable force in circumstances that are not mentioned in those statutes. This is a question of statutory interpretation. Our primary objective when construing a statute is to evince the intent of the legislature. *Castro v. Lemus*, 2019 UT 71, ¶ 17, 456 P.3d 750. Accordingly, the function of canons of construction "is to assist in ascertaining the true intent and purpose of the statute." *Salt Lake City v. Salt Lake Cnty.*, 568 P.2d 738, 741 (Utah 1977).

¶62    The *expressio unius* canon holds that "the statutory expression of one term or limitation is understood as an exclusion of others." *Nevares v. M.L.S.*, 2015 UT 34, ¶ 31, 345 P.3d 719. This canon "does not apply to every statutory listing or grouping." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Rather, "it has force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice [and] not inadvertence." *Id.* (citation omitted) (internal quotation marks omitted). In this regard, *expressio unius*

> depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded . . . [and] properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference.

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (citations omitted) (internal quotation marks omitted).

¶63    In other words, inferences from statutory silence necessarily depend on context. *Marx v. Gen. Revenue Corp.*, 568 U.S 371, 381 (2013). And sections 53-10-404 and 77-23-210 do not offer a context that compels such an inference.

¶64    As discussed, section 53-10-404 and its associated provisions establish an administrative procedure for collecting DNA samples from certain persons without a warrant. The statute

contains no provisions related to obtaining DNA pursuant to a warrant or the execution of search warrants more generally.

¶65 Evans provides no argument as to why the statutory language here should be read to infer that by establishing an administrative procedure for a search that does not require a warrant, the legislature implicitly intended to reach and regulate searches conducted pursuant to warrants. *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) ("The *expressio unius* canon applies only when circumstances support[] a sensible inference that the term left out must have been meant to be excluded." (alteration in original) (citation omitted) (internal quotation marks omitted)). Nowhere does section 53-10-404 purport to comprehensively regulate when reasonable force is permissible in the execution of search warrants. And the only thing we infer from the statute's silence on this matter is that the statute is simply about something else.

¶66 The other statute Evans relies upon, section 77-23-210, creates rules for a specific setting: the search of physical structures and other enclosures. It contains no provisions about the execution of search warrants or the use of force outside of this context.

¶67 And again, Evans has provided no textual basis to sensibly infer that the legislature intended this statute's regulation of the search of a building to implicitly limit the search of a person. Like section 53-10-404, section 77-23-210 does not purport to comprehensively address when reasonable force is permissible in the execution of search warrants more generally. We infer from this silence only that the legislature intended to limit the reach of this statute to the search of physical structures and enclosures.

¶68 As the Supreme Court has made clear, *expressio unius* "does not apply unless it is fair to suppose that [the legislature] considered the unnamed possibility and meant to say no to it." *Marx*, 568 U.S. at 381 (citation omitted) (internal quotation marks omitted). Sections 53-10-404 and 77-23-210 do not give rise to the negative inference Evans advances.

¶69 Accordingly, we affirm the court of appeals' rejection of Evans's statutory arguments.

## CONCLUSION

¶70 We hold that the court of appeals did not err in affirming the district court's denial of Evans's motion to suppress evidence

obtained from the buccal swab under the Fourth Amendment. Nor did it err in rejecting Evans's statutory arguments.

¶71 We affirm.

————————